**STANDARD BRANDS, Inc., v. FEDERAL YEAST CORPORATION.**

No. 1421.

District Court, D. Maryland.
Feb. 10, 1930.

Warfield & Watson, of New York City, and Marbury, Gosnell & Williams, of Baltimore, Md., for plaintiff.

Howson & Howson and Charles H. Howson, all of Philadelphia, Pa., Fish, Richardson & Neave, of Boston, Mass., and Wyman & New, of Baltimore, Md., for defendant.

SOPER, District Judge. The bill of complaint in this case was filed on August 31, 1928, by the Fleischmann Yeast Company, for which Standard Brands, Incorporated, was subsequently susbtituted as complainant. The bill charged the Federal Yeast Corporation, the defendant, with infringement of United States letters patent Nos. 1,449,102, 1,449,105, and 1,449,106, and prayed for an injunction against continuance of the infringement and for an accounting for damages and profits. For convenience, these patents will be hereinafter referred to as patents 102, 105, and 106, respectively.

The defendant's answer sets up the defense of invalidity of each of the patents, and also denies infringement thereof. The trial and oral argument of the case was had during the period from October 1 to October 14, 1929.

The patents relate to processes for the manufacture of bakers' yeast and the product of such processes. A prior suit between the Fleischmann Yeast Company and the same defendant, involving United States letters patent No. 1,449,103, also relating to the manufacture of yeast, resulted in a decree in which the validity of the patent and infringement by the defendant were established. In the same litigation United States patent No. 1,449,127 was declared invalid. Both parties appealed. The decision of the District Court is reported in 8 F.(2d) 186, and the affirmance thereof on appeal in 13 F.(2d) 570. Patent 103, as well as the three other patents involved in the pending suit, was based on applications filed by Friedrich Hayduck, of Wilmersdorf, Germany, assignor to the Fleischmann Company, and were granted under the provisions of the Nolan Act of March 3, 1921, 41 Stat. 1313, USCA tit. 35, § 80. The four patents were issued on the same date, March 20, 1923. The effective priority dates, however, corresponding to the respective applications in Germany, are as follows: For patent 102, February 24, 1915; 103, March 15, 1915; 105, March 16, 1915; 106, March 19, 1915.

Patent 103 covered the process of manufacturing bakers' yeast, which comprised the preparation of a yeast nutrient solution containing sugar material with inorganic ammonium salts as an additive source of nitrogen, and, during the period of propagation, neutralizing, by an antacid substance, the deleterious acidity created by the use of the salts. Some description of the nature of yeast and of the art of yeast manufacture may be found in the prior opinion of this court. The discussion therein, infringement being admitted, was confined chiefly to the validity of the patent in relation to the prior art. The gist of the patent was the discovery that inorganic ammonium salts may be used to great advantage in the yeast industry, and that the harmful acidity which attends their use may be overcome by the process of neutralization. The trial of this case was held during the week of October 7, 1924, and the decree of the court was entered on May 9, 1925. After it had been affirmed on appeal, an order was passed on July 24, 1926, at the request of the parties, referring the case to a special master to state an account of the profits and damages to which the plaintiff was entitled. The report of the special master was filed on November 16, 1929, and exceptions thereto were filed in the following month. Before the hearing on these exceptions took place, the second case involving the three remaining patents was heard. Subsequently, on December 27, 1929, the exceptions to the master's report in the first case were argued before the court, and it was then stipulated that the evidence taken before the master in the accounting proceedings and that before the court in the second case might be used by the court interchangeably in either case.

It will be necessary to discuss each of the three patents at length in view of the character of the defenses raised. For convenience, however, it is well now to state generally the character of each patent:

Patent 102 resembles the process of patent 103, in that it involves the use of a nutrient solution, consisting of essentially sugar material and inorganic ammonium salts, but differs from patent 103 in that it seeks to overcome the harmful effect of mineral acidity by the high dilution of the nutrient solution instead of by neutralization.

Patent 105 has reference to the method in which the nutrient material is handled during the period of propagation, and is applicable generally to worts suitable for the growth of yeast. In the method usually employed in yeast factories prior to the adoption of the invention, all of the nutrient material was placed in the propagating vat at the beginning of the operation, and such a mash is described in this case as a straight set mash. By the method disclosed in patent 105, this process is abandoned and propagation of the yeast is initiated in a dilute portion of the wort, and thereafter the remainder of the wort of higher concentration is added substantially continuously during the period of propagation.

Patent 106 combines the disclosures of patent 103 and patent 105. There is employed the manipulative feature of patent 105 in the propagation of yeast in a nutrient solution consisting of sugar material and inorganic ammonium salts, together with the neutralization feature of patent 103.

The detailed description of the patents in suit and a discussion of the defenses of invalidity and infringement may be considered most conveniently in the following order: Patent 105, patent 106, and patent 102.

## Patent 105.

The important feature of the process disclosed by this patent relates to the method in which the mash or wort is introduced into the propagating vat. A feeding process, referred to in the testimony as the Zulauf feed, is prescribed, whereby a comparatively small part of the nutrient solution is diluted, placed in the vat and seeded with yeast, and, after it has begun to grow and propagate, the remainder of the wort is fed in gradually to supply its increasing needs. As we shall see, this change has been accompanied by a great increase in the yield of yeast from raw material in the modern yeast factory.

The experts now agree that, in the growth of yeast, it is desirable to have neither too much nor too little of the necessary foods. During the propagating period, the microscopic organism of yeast grows to a certain maturity, and then divides or splits to form additional cells, so that under ideal conditions there is a progressive geometric increase in the number of cells until all the nutritive material has been consumed. It is obvious that, unless sufficient food is produced for the growing organisms, they cannot thrive to the best advantage. On the other hand, it is equally important that not too great an amount of food be introduced. There must be sufficient space in the propagating vat to enable the respective cells to reach maturity without undue interference with each other; for it is known that, in the course of growth, the cells excrete alcohol and carbonic acid gas, which have a poisonous effect when present in too great quantities upon other cells in the neighborhood. Furthermore, it is equally well settled that too great a supply of sugar material will bring about the production of more alcohol than the yeast can assimilate and thereby retard the growth of the yeast. It has been picturesquely said that the Hayduck procedure avoids the extremes of feast and famine, and that it aims to maintain throughout the period of propagation an optimum concentration of materials.

The specification expressly declares that the patent relates to a low alcohol yeast process. Prior workers in the field, it is admitted, had already pointed out that, to accomplish this purpose, the wort should be diluted to such an extent that the alcohol produced from the sugar could be assimilated by the yeast as nourishment. It had also been disclosed by the Rainer patent, hereinafter discussed at length, that one method of achieving the desired result was to add the peptone (nitrogenous material) continuously, and the sugar at intervals as required. The particular method disclosed by the Hayduck specification is substantially as follows: A wort having, for example, a gravity of 12° Balling is prepared according to the procedure commonly followed in the industry. A part of the wort is placed in the vat and highly diluted, for example, to about 1° Balling. Seed yeast is added and aeration follows. Thereupon the remainder of the concentrated wort is added slowly and substantially continuously at such a rate that the alcohol formed in both portions of the wort is immediately assimilated by the yeast. The quantity of the diluted wort originally placed in the vat is so chosen that the mean content of the entire wort would be from 3° to 5° Balling.

The patentee states that by this method the yeast is constantly given new supplies of all nutriment necessary for its propagation, and there is always a wort concentration by means of which the nutriment is absorbed most efficaciously and quickly by the yeast. In other words, there is offered the advantage of great dilution, while the concentration of the wort calculated for the entire quantity remains the same. The advantage of this procedure is contrasted with that customarily used in the manufacture of yeast, for therein propagation begins in a relatively concentrated solution and the concentration is decreased gradually during propagation.

The plaintiff relies on all the claims of the patent, of which claims 4, 6, and 10 are considered typical. They are as follows:

"4. A process of propagating yeast with a relatively low yield of alcohol which comprises preparing a wort containing all essential yeast nutrients in solution, initiating propagation of yeast in a diluted portion of said wort, aerating the diluted portion, and substantially continuously adding during the period of propagation, a wort of higher concentration, at a rate such that the yeast may propagate and substantially all of the alcohol which may be formed is assimilated by the yeast."

"6. A process of propagating yeast with a relatively low yield of alcohol which comprises, preparing a wort containing all essential yeast nutrients in solution, initiating propagation of yeast in a diluted portion of said wort, aerating the diluted portion and slowly and substantially continuously adding the wort of high concentration, which addition is effected until near the end of the period of propagation."

"10. A process of propagating yeast with a relatively low yield of alcohol which comprises, preparing a wort containing all essential yeast nutrients in solution, initiating propagation of yeast in a highly diluted portion of said wort, aerating the diluted portion, and substantially continuously, adding during the period of propagation, the wort of higher concentration at a rate such that the concentration of the dilute wort remains substantially constant, whereby substantially all of the alcohol which may be formed is assimilated."

Claim 6 is typical of claims 1, 2, 3, 5, and 7, while claims 4 and 10 are illustrative of the remaining claims of the patent.

A consideration of these claims shows a distinction between claim 6, on the one hand, and claims 4 and 10 on the other. Claim 6 contains the following three elements: (1) Preparing a wort containing all the essential yeast nutrients in solution; (2) initiating the propagation of yeast in a dilute portion thereof; (3) substantially continuously adding a wort of higher concentration during the period of propagation.

Claims 4 and 10, on the other hand, contain another element in addition to those above described, namely, a description of the rate at which the concentrated part of the wort is added to the more dilute portion. In claim 4 the rate is described as such that the yeast may propagate and substantially all the alcohol formed may be assimilated by the yeast; while in claim 10 the rate is such that the concentration of the dilute wort remains substantially constant, whereby substantially all the alcohol formed is assimilated. It is obvious from the foregoing description that the maintenance of the food supply at the proper level by regulating the rate of addition is a most important feature of the patent; and hence claims 4 and 10 cover the invention much more comprehensively than claim 6. Indeed the parties have directed the greater part of their discussion to claims 4 and 10 in considering the validity of the patent. This matter will now be discussed in the light of the prior art.

### The Validity of Patent 105.

### The Rainer Patent.

The defendant's chief reliance to support the charge of invalidity is the German patent of Rainer of 1879. Hayduck refers to this patent in his specification as one which has the same object in view and employs a somewhat similar process. The defendant goes further and asserts that the Rainer and Hay-

duck patents are on exactly the same basis, that both contemplate the starting of propagation in a wort of high dilution, so that yeast production is favored at the expense of alcohol, and that both direct that throughout the greater part of the period of propagation nutritive substances should be supplied to the fermenting liquid continuously and at such a rate that the solution in the vat may be kept substantially constant at the chosen concentration. If this is the case, the Hayduck patent necessarily fails, since it is anticipated in every important point; and hence it will be necessary to examine this reference with care.

The details of the Rainer method are disclosed in the patent in some confusion; but the preparation and treatment of the mash seem to be substantially as follows: First a process of peptonization is employed in which vegetable albuminous substances from cereals, corn, legumes, or from industrial refuse, such as bran, malt, sprouts, etc., are treated with acid and a diastace, for the purpose, as explained in the testimony of the experts, of breaking down or degrading the complex chemical compounds in these substances into simpler forms so as to render them assimilable by the yeast. The preparation of the sugar material necessary for the propagation of yeast, and the addition thereof to the peptone material is then described in the following language:

"Corresponding to the peptone content of the liquid, there is added an amount of liquified starch which has been transformed into dextrose by cooking in the usual manner with addition of mineral acid; or maltose, molasses or, finally sugar, equal to about half of the dry weight of the peptone, together with some pitching yeast (beer yeast or pressed yeast), for initiating the growth of the yeast; however, the carbohydrate thus added must always amount to no more than $\frac{1}{2}$ of 1 per cent. of the total weight of the liquid; it then serves exclusively for the formation of cell tissue."

The patent then describes at length the temperatures at which yeast may be best grown and the aeration which is necessary for efficient propagation. There is next set out the following paragraph, which is the first suggestion in the document that additions may be made during the propagation of the yeast to the mixture of peptone and sugar worts above described:

"Depending on the larger or smaller density of the nutritive liquid employed, on the

higher or lower temperature of this liquid, and on the ozonized air that is introduced, the growth of the yeast after each larger addition of dextrose, maltose, etc., is finished within 6 to 8 hours. The peptone content of the mass may be 1 to 2 per cent. or more of its weight, whereas of dextrose or other carbohydrates there should be added each time only ½ to 1 per cent. in order to prevent the occurrence of lactic or alcoholic fermentation and to surely prevent such losses in my process.

"When, after 6 to 8 hours, the added dextrose or other kind of sugar has been wholly or for the most part consumed in the growth of the yeast, a further portion thereof, amounting to ⅟₂₀ to ⅟₁₀ per cent. is added; and similarly the peptones, after they have been consumed, may be added in portions or run into the liquid slowly and continuously, so that the same nutritive solution, by successive replacement of the substances consumed, may remain in use for weeks and months insofar as it is not contaminated by other substances or by side fermentations and thus rendered unsuitable for further use."

The procedure thus outlined is referred to in this case as Rainer's first illustrative example. There follows provision for the successive removal of the yeast as grown from the fermenting vat, and then a second illustrative example or method is given in the following language:

"In order to obtain a yeast as pure as possible and free from side ferments, the nutritive liquid may, to be sure, be made still thinner, that is, prepared with a peptone content of ¾ to 1 per cent. and the carbohydrates (dextrose, maltose, etc.) also in smaller amounts (the first portion about ⅓ per cent., then about ⅟₂₀ per cent. every 3rd hour); then, when there is introduced a sufficiency of pure air that has been led through sulphuric acid, or of ozonized air, the peptones that are present will for the most part be transformed into yeast within 12 to 15 hours at a temperature of 16 to 17° R. The entire liquid is then cooled by means of a cooler or by addition of cold water or ice to about 6 to 8° if possible; when the depth of the liquid is from 80 to 90 centimeters the yeast settles to the bottom almost completely within 12 to 14 hours, whereupon the exhausted nutritive liquid may be disposed of by way of the sewer."

After this example, directions are given for the purification and pressing of the yeast, and finally the yield of yeast to be expected from the processes described is expressed in the following language:

"From each 100 kilograms of pure peptone (dry weight) there are produced, according to experience thus far, 250 to 300 kilograms of pure and strong pressed yeast for the production of which there are required only about 200 kilograms of dextrose or sugar."

It is not easy to follow the sequence of the steps in this procedure. What is meant by the phrase, "the growth of yeast after each larger addition of dextrose, etc., * * * is finished within six to eight hours," which is found in the second quoted paragraph of the patent. Only one addition of sugar material is previously mentioned in the patent, to wit, that of the so-called sugar wort to the peptone wort. Perhaps this paragraph was intended to follow rather than precede the succeeding paragraph in which a smaller quantity of sugar (one-twentieth to one-tenth per cent. instead of one-half per cent.), is added at the end of the sixth to eighth hour when it would seem that the growth of yeast from the materials first supplied in the peptone wort and sugar wort has been finished. If this view is correct, then the patent means that first the peptone and sugar worts should be combined to form a nutritive solution with a peptone content of one to two per cent. of the weight of the mass, and a sugar content of one-half of this amount, and that the mixture be then seeded, and used as an ordinary straight set mash for the growth of the yeast.

Accepting this construction of the first step in the successive replacement process, the next query is, how many additions of one-twentieth to one-tenth per cent. of sugar are to be made during the subsequent growth of the yeast, and what amount of peptone is to be added in portions or slowly and continuously, and, if in portions, at what intervals. The answer may be that the sugar is to be added in the quantities mentioned at intervals as consumed, and the peptones either at intervals or continuously in such quantities that at no time shall the ratio of sugar to peptone exceed one to two, and that, at the end of the growth of each crop of yeast, it will be found that the amount of each of the worts actually consumed will be in the ratio of one of peptone to two of sugar. This seeming contradiction in the ratio between the substances actually consumed and that existing during the growth of the yeast is due to the fact, as the experts agree, that all of the peptone in the material is not assimilable

by the yeast, and that consequently the sugar is consumed faster than the peptone.

This reading of the patent would seem to be the one most favorable to the defendant's contention. Yet, if it be accepted, it is still not clear that Rainer's patent contained the elements which constitute the substance of the Hayduck procedure. It does not appear that the ratio between the materials remains constant throughout the propagation of the yeast. Nor does Rainer show that there is any particular virtue in the continuous addition of the nutritive material, as consumed, rather than the replacement of it at intervals, when consumed. It seems to be certain that during the first interval of six or eight hours, the peptone and sugar material are mixed together as a straight set mash. It is not explained why the feeding process is substituted for the straight set mash in the subsequent intervals of the replacement process. If the yeast grows satisfactorily during the first interval of six or eight hours in a straight set mash, so long as the amount of sugar is kept down to a point where all of the alcohol is consumed by the yeast, it might be supposed that the same method could be safely used in the succeeding intervals of the continuous process.

Moreover, it clearly appears in the second example that only the sugar is added at intervals, whilst all of the peptone is placed in the vat at the beginning of the period of propagation. The patentee seems to prefer this process, for he advised that it be used when it is desired to obtain a yeast as pure as possible and free from side ferments—that is to say, from alcoholic fermentation. Not only is all of the peptone added at the beginning of the period, but the sugar itself is not added continuously but only in portions at three-hour intervals. There is a total sugar content of about one-half per cent., with peptone of three-fourths to one per cent., but it is obvious that, during the twelve to fifteen hours prescribed for the growth of the yeast in the second example, there is a continuous diminution in the quantity of the peptone material as it is consumed by the growing yeast, and a fluctuation in the amount of sugar from a maximum sugar content at the beginning of each three-hour interval to a minimum sugar content at the end of each such interval. It does not seem possible to conclude either from the first or the second example, or from both together, that the patentee had discovered that either a continuous addition of materials or a relative constancy of concentration was particularly desirable. The main admonition of the patent was that the operator

should not at any time add so much sugar that the alcohol produced could not be consumed by the yeast.

This conclusion is fortified by the disclosures of Rainer's Belgium patent, which was granted on October 28, 1879, shortly after the issuance of the German patent on October 12, 1879. The two patents are obviously based on the same subject-matter and have the same design. The Belgium patent, like the German, contemplates that, if desired, the same nutritive liquid may serve for weeks or months by successive renewals of the substances consumed, but the addition of the nutriment, either at intervals or continuously during the growth of the yeast, is not directed. The operator is advised that the proportion of peptone may be 2 to 3 per cent. of the weight of the mass, or even more, where as more than 1 to 1.25 per cent. of sugar material should not be added each time in order to prevent the production of alcohol. In place of the third quoted paragraph from the German patent, the following is set out:

"When, after 6 to 8 hours, the dextrose or other added sacchariferous substance has been entirely or for the most part consumed in the vegetation of the yeast a new portion thereof is added, and in the same way there may be added to the liquid portions of the peptones when these substances have been consumed, in such a way that the same nutritive liquid, by successive renewals of the substances consumed, may serve for weeks or months provided that it is not rendered impure by other substances and unsuitable for renewed use."

Hence it would seem that the additions of nutritive substances were to be made only at the expiration of the period during which the yeast had been fully grown, and that the patentee did not consider the addition of materials either at intervals or continuously during growth of sufficient importance to be inserted in his Belgium document. He obviously contemplated a succession of straight set mashes and a progressive diminution of concentration therein during each six to eight hour period. Substantial constancy of concentration during the period of propagation was not achieved.

The defendant points out that there is some inconsistency in the description by Hayduck of the Rainer process as it is found in the German counterpart of the Hayduck patent 105, and in the original application for United States patent, on the one hand, and the description of the process as it appears in

the final amended specification of the United States patent on the other. Whereas in the first-mentioned documents the feed is described as being either continuous or at intervals, with reference to both the peptone and the sugar material, the feed is described in the last-mentioned document as being at intervals with regard to the sugar material and continuously in regard to the peptone. The interpretation last given is, however, the correct one, and the differences serve chiefly to show the difficulty of understanding the Rainer patent.

The defendant also urges that the differences which Hayduck points out in his specification of patent 105 between his process and that of Rainer pertain particularly to matters other than continuity of feed and constancy of materials. Hayduck says in susbtance that (1) the Rainer procedure requires analysis in order to determine when additions of material should be used; (2) the Rainer procedure requires large tanks and apparatus, a conclusion based upon the idea (probably mistaken) that the Rainer process contemplated the addition of the material in a highly diluted form rather than in a concentrated form; and (3) that the Rainer process did not provide for a wort of usual constitution because of the peptone sugar ratio of two to one. The defendant urges that none of these distinctions of Hayduck are based on solid foundation; that materials could be added in a concentrated form rather than in solutions of abnormal size; that analysis would hardly be needed since the action of the materials could be foretold and such supervision or tests as were necessary would be simple and quickly made; and further that the actual constituents of the wort, as consumed by the yeast, would be in a peptone sugar ratio of one to two, which is customary in the art. It may be conceded in this case that Hayduck placed an exaggerated importance upon the items discussed. But it does not follow that his patent may not be differentiated from that of Rainer on the two main particulars which have been already discussed. That discussion has shown that Rainer had no clear perception of the advantages to be derived from a continuous feed and a substantial constancy of material constituents of the wort, and that, on the other hand, Hayduck disclosed these elements.

The defendant's subsequent references to the prior art are far less explicit than Rainer. There is cited from La Far's Handbuch der Technischen Mykologie, published in 1907, an excerpt entitled "The Character of the Nutritive Solution." It relates to the production of alcohol. The author shows that taxation of the alcohol industry is sometimes regulated by the size of the fermenters employed, and hence in such cases it is to the interest of the distillers to make their mashes as concentrated as possible. There is, however, a limit to this expedient, because too great a sugar content will impair the growth of the yeast and interfere with its fermentative powers. To obviate this difficulty, manufacturers in molasses distilleries resort to a so-called drauflassen process; that is, they establish in the molasses such a dilution as experience shows will still admit of a smooth progress of the fermentation, and then gradually add thick molasses to the fermenter as the sugar present therein is fermented. The object, of course, is not to prevent but to promote the formation of alcohol. The article then states that in the breweries the process is not infrequently resorted to when the amount of seed yeast is insufficient and has to be quickly multiplied. It is plain that the object in view is the manufacture of yeast, not as an end product, but for use in the fermentation of a beer mash. The article teaches that too much sugar in the wort makes alcohol at the expense of the yeast, and that the difficulty may be overcome by gradually adding to a solution of molasses of a dilution not clearly stated a thick material as the sugar is used up. But there is no statement that the process is practicable in the commercial manufacture of yeast. Nor is it clearly set out that the addition should be made continuously, and no suggestion of Hayduck's idea is found, that a constancy of concentration of all of the constituents necessary for the growth of yeast should be maintained by regulating the rate of the continuous feed.

The Wochenschrift für Brauerei, which appeared January 18, 1903, contains an article by M. Delbrück entitled "Some Fundamental Principles of Yeast Multiplication." This publication is evidently devoted to the interest of the brewing business, and the article relates to the use of yeast for its fermentative properties in the production of alcohol rather than the propagation of yeast as a final product. The author shows that yeast cells in a mash mutually exert a distributing effect on one another because of poisonous substances excreted by the cells, consisting chiefly of alcohol and carbonic acid. It is desirable that there should be a uniform quiet motion in the liquid to insure the uniform distribution of the yeast cells throughout its entire area. If there is such motion, the individual cells are moved away from the poisonous products in

their immediate neighborhood. Motion can be evoked by a stirring mechanism, or by the manner in which the process of fermentation is started. ` If seed yeast is added to a small amount of the liquid to be fermented, it at once brings the liquid into active fermentation and movement because the cells are present in excess. If there is then added to this liquid the main part of the liquid, the strong movement is at once transferred to the latter. "For this reason the strongest multiplication is given by the continuous fermentation process according to which the pitching yeast is first placed in a large fermenting vat along with a little wort and then a stream of fresh nutritive liquid perhaps distributed over a period of twenty-four hours is run in until the vessel is full."

The defendant contends that this is a clear disclosure of a process for the propagation of yeast in which seed yeast is placed in a small part of the wort, which becomes more dilute than the reserve portion by reason of the consumption of nutrition by the yeast; and that thereafter, the more concentrated portion is continuously fed into the mixture for a period of twenty-four hours. The suggested procedure obviously involves a multiplication of yeast in a continuous feeding process; but the article does not clearly direct a high dilution of the initial liquid as compared with the reserve portion to be gradually added, or that there should be a substantial constancy of concentration of food stuffs to make a balanced feed. Even if the article be considered solely with reference to the light which it throws upon the best multiplication of yeast, it is obvious that the author emphasizes the desirability of imparting to the nutritive liquid a certain constancy of movement of the yeast cells so as to separate them from each other and distribute them as evenly as possible throughout the liquid rather than upon a regulation of the quantity or quality of the food supply.

Other references of the defendant to the prior art may be briefly mentioned. An excerpt entitled "The Building Up of Yeast" is taken from the Brennerei-Lexikon, a publication devoted to the distilling industry. The propagation of large amounts of yeast from small quantities of seed yeast for use in beet and molasses distilleries is discussed. Propagation is begun in a small part of the wort, not diluted, and after it has been attentuated to one-half its concentration by consumption of the nutriment, fresh wort is gradually added from time to time. It does not appear that the author regarded the process as a suitable one for making yeast

as such, for the same publication contains elsewhere directions for the commercial manufacture of yeast which make no reference to the addition process. There is no statement that the addition is made to prevent alcoholic fermentation, or that the writer appreciated the advantages of a continuous over an interrupted feed and the maintenance of substantial constancy of concentration.

The British patent to Blake of 1861 covers a process for making beer. The process is started in the larger part of the wort, and, after one-fourth to three-fourths of its sacchariferous matter has been decomposed, the remainder of the wort is gradually added in a continuous stream. The purpose seems to have been to improve the flavor and keeping qualities of the beer. No reference is made to the manufacture of yeast.

The British patent to Vignier of 1904 is entitled, "Improvements in the Fermentation of Wines, Wash or Beer and in the Making of Yeast for Distilleries." It shows that, when a wine of high alcoholic strength is desired, the must may be introduced by automatic fractions into the vat, and thereby rapidly converted into alcohol. The patent involves a certain regulation of food supply, and it may be assumed that a similar procedure might be applied in the manufacture of yeast. But the only dilution of the initial wort is that caused by the conversion of the material into alcohol; the process is discontinuous, and there is no attempt at constancy of concentration.

The United States patent to Claudon and Vigreux of 1883 discloses a process for the production of a fertile yeast from the ordinary mixed wort of grain and molasses, for use in the fermentation of other similar worts, or for bread making. A quantity of yeast generally used in distilleries is diluted in a portion of the wort in the fermenting vat, and the vat is then gradually filled up with the rest of the wort. The time consumed in the filling process would seem to be about three hours, for it is said that the vat is filled in two hours after fermentation has become fully active; that is to say, after the expiration of about an hour. The total time consumed in the process is 97 or 98 hours. The defendant's expert offered in evidence the report of an experiment purporting to have been performed in accordance with the patent; but actually the test differed from the disclosure in important particulars, and therefore throws no light on the issues involved in this case. The patent merely shows that it is feasible to begin the propagation of

yeast with a part of the wort and then to feed in the remainder gradually during a very small part of the entire time consumed by the process. There is no dilution of the initial part except such as invariably follows from the consumption of the food materials by the yeast. No attempt is made to maintain a substantial constancy of concentration. Indeed, during by far the greater part of the period of growth, the wort is a straight set mash.

The German patent to Kamienski of 1912 covers a process for the preparation of pressed yeast. The gist of the patent is a second seeding of pitching yeast which is added along with concentrated wort while the fermentation is not yet finished. The patent does disclose the addition of a concentrated to a highly diluted portion of the wort, but there is no indication as to the rate of addition; nor does it appear that the feeding process is continuous or the concentration constant.

When these scattered citations are considered as a whole, it appears that certain of the features of patent 105, taken separately, were known to the prior art. The division of the wort into two parts, the beginning of propagation in one part, which had been diluted, and the addition of the other part continuously or at intervals, the restriction of alcohol production by regulating the supply of sugar—these several suggestions may be gathered together from the literature. But no publication shows the combination of elements found in claims 4 and 10 of the patent. These claims contain not merely the negative admonition that the sugar material be not fed too fast to the growing yeast. They indicate, when considered in the light of the specification, a process wherein the yeast is constantly given new supplies of all necessary nutriment by a continuous addition, so that there is always a wort concentration for the efficacious growth. The regulation of the rate of addition so that the yeast may propagate and substantially all the alcohol formed may be assimilated, and the maintenance of substantial constancy of concentration of nutriment, through regulation of the rate of addition, are not found in any reference in combination with the other elements expressed in these claims.

■ It does not appear to the court that the information afforded the inventor by the prior art was so clear and complete as to anticipate the patent. Inventions cannot be invalidated by the mere introduction of prior publications unless the description is so full,

clear, and exact as to enable any person skilled in the art to make and practice the invention, and the rule is enforced with particular strictness when the disclosures are found in foreign patents or publications. Permutit Co. v. Harvey Laundry Co. (C. C. A.) 279 F. 713, 718, 720; Loew Filter Co. v. German American Filter Co. (C. C. A.) 164 F. 855, 860. Selectasine Patents Co. v. Prest-O-Graph Co. (D. C.) 267 F. 840, 842; Bone v. Marion County, 251 U. S. 134, 40 S. Ct. 96, 64 L. Ed. 188; and cased cited in 8 F.(2d) 186, 197.

■ The commercial success of the process disclosed in the Hayduck patent 105 tends to show its validity. Where there is doubt as to the clearness and completeness of prior publications, the commercial success of a patent, especially in a crowded field, may be taken as strong evidence that the matter disclosed was not obvious to the ordinary person skilled in the art, for otherwise it would have been reduced to practice. 8 F.(2d) 196, 198, and authorities there cited. It was shown in the earlier case that, by the use of the process of patent 103, the yields in the plaintiff's factory were increased from 35 to 65 per cent. on the raw material. The present method of the plaintiff is to combine the process of patent 103 with that of patent 105, and the result has been a substantial increase in yield, so that there is now obtained an average of 80 per cent. of yeast from the raw material. The defendant has also achieved a corresponding increase in the yield in its factory by the adoption of the Zulauf process. It is admitted that these yields are unprecedented in the yeast industry, but it is suggested that the increase is not entirely due to the additive method of food supply. Some part of the increase may have been due to the growing efficiency of the plaintiff's manufacturing operations; but the greater part of the increase cannot be accounted for except by the change of manufacturing method which the adoption of the present invention has brought about.

■ It is not unreasonable to contrast with these results what may be expected from the employment of the Rainer process. This was calculated by the plaintiff's expert on the basis of an experiment performed by the defendant and introduced in evidence in which the raw material for the peptone mash consisted of sprouts. Using the method prescribed in Rainer's second example, from which it appears that only one-fourth of the peptone in the material was assimilable by the yeast, and three-fourths thereof was lost in the process, it was estimated that a yield

of only 5 per cent. on the raw materials could be expected of the Rainer process and that the cost was therefore prohibitive. This testimony was disputed, but, without discussing the matter in detail, it is sufficient to say that the evidence that the yield would be unsatisfactory commercially is convincing. Moreover, there is the statement in the Handbuch der Presshefen Fabrikation by Kiby, one of defendant's references, that the Rainer process was not successfully exploited on a large scale, because the attempt was thoroughly unsuccessful. The admissibility of this statement as proof of the fact stated is open to question; but it may be considered in estimating the anticipatory value of the Rainer reference. Certainly a skilled worker, with the Rainer patent before him, together with the statement of its impracticability, would not be justified in concluding that the disclosure of the patent was of much practical value. On the contrary, he would be led to search for the defects in the process so as to take the last step in order to transform failure into success. As the evidence indicates that Hayduck has rendered this service, the patentability of his disclosure is established.

It has been pointed out that claim 6, which is illustrative also of claims 1, 2, 3, 5, and 7, is broader than the claims which have just been discussed, in that it omits any reference to the rate of feed. The defendant contends that these claims are invalid because, when literally construed, they cannot be distinguished from the information furnished by the prior art already discussed. But this conclusion does not necessarily follow. Meritorious patents are frequently saved by interpreting the language of the claims so as to include restrictions on limitations appearing in the specification. Bisight Co. v. Onepiece Bifocal Lens Co. (C. C. A.) 259 F. 275, 276; Van Ness v. Layne (C. C. A.) 213 F. 804, 807; Fowler & Wolfe Mfg. Co. v. McCrum-Howell Co. (C. C. A.) 215 F. 905, 909; Permutit Co. v. Wadham (C. C. A.) 13 F.(2d) 454, 458; Gibbs v. Triumph Trap Co. (C. C. A.) 26 F.(2d) 312; Smokador Mfg. Co. Inc. v. Tubular Products Co. (C. C. A.) 31 F.(2d) 255, 257. Whether it is necessary or proper to apply this rule of interpretation to claims 1, 2, 3, 5, 6, and 7 in order to save them, need not be decided. Indeed it is not necessary to pass upon either the question of validity or upon the question of infringement of these claims. It appears from what has already been said that the other claims of the patent, limited as they are by reference to the rate at which the concentrated wort is added, are valid, and it will hereafter appear that they have been infringed by the defendant. Hence the question raised as to the broader claims is purely academic.

### Infringement of Patent 105.

In order to prove infringement of this patent, the plaintiff put in evidence seven mash sheets of the defendant company which show actual factory operations from 1923, when defendant was infringing patent 103, to the present day. These mash sheets are identified by the following numbers, to wit: 245, 420, 668, 1094, 1368, 1901, and 2086.[1] Mash 2086 is offered in evidence only in connection with patent 102. The plaintiff claims that all of the other numbered mashes infringe patent 105. Of these mashes, five may be classified and treated together, to wit, 245, 420, 668, 1094, and 1368. The operations involved therein are distinguished by the fact that the reserve portion of the wort is fed into the initial portion in a single stream, whereas in mash 1901, the reserve wort is divided into two portions in similitude to the Rainer process, as will hereafter appear.

A description of mash 245 will serve for the five mashes classified with it. A mash or wort, consisting of grain and molasses, together with sprouts and sour stock, is made up in the usual way. The wort is divided into an initial fraction highly diluted to a balling of 1.9° and a reserve part of high concentration, which is not specified in figures in mash 245, but ranges in other mashes from 15° to 19.8°. Ammonium phosphate, which

[1] The constituent materials of these mashes, and also of the defendant's all-molasses mash are set out below. The all-molasses mash of the defendant was given in evidence in the first case to show the infringement of patent 103.

Raw Materials Used Calculated to a Common 6,000 Pounds Basis

Mashes Including Molasses.

| Mash No. | 245 | 1368 | 1901 | 2086 | All Molasses |
|---|---|---|---|---|---|
| Molasses | 6000 | 6000 | 6000 | 6000 | 6000 |
| Malt | 1935 | 2800 | 2250 | 1350 | .... |
| Corn | 2325 | 1200 | 1125 | .... | .... |
| Sprouts | 2710 | 2000 | 1685 | 1500 | .... |
| Amm. Phos. | 195 | 120 | 150 | 111 | 100 |
| Amm. Sulph. | 195 | 180 | 229 | 213 | .... |
| Aqua Amm. | 485 | 128 | 146 | 190 | 140 |
| Chalk | .... | 10 | ... | ... | ... |
| Sulphuric Acid | X | 60 | 41 | 64 | 32 |

Mashes not Including Molasses.

| Mash No. | 420 | 668 | 1094 |
|---|---|---|---|
| Malt | 2700 | 1700 | 2000 |
| Corn | | 1000 | 600 |
| Sprouts | 900 | 1000 | 900 |
| Amm. Phos. | 50 | 35 | .... |
| Amm. Sulph. | 30 | 25 | .... |
| Aqua Amm. | 30 | ... | .... |
| Chalk | ... | 20 | 35 |
| Sulphuric Acid | 16 | 16 | 50 |

is an inorganic ammonium salt, is added to the initial portion of the wort. Beginning with the second hour and continuing until the twelfth hour, the reserve portion is fed into the vat continuously. There is no direct evidence as to the rate at which the feeding process occurs, or as to whether the rate increases during the growth of the yeast. It is stated in defendant's brief that the rate is constant. The balling of the mixture falls from 1.9° to 1.2° between the first and the fifth hour. It then increases from 1.1° to 2.2° between the fifth and the twelfth hour. During this last-mentioned period, there are eight additions of ammonium sulphate in equal portions. From the twelfth to the fifteenth hour, the balling increases from 2.2° to 2.5°. A portion of this increase is due to the formation of the yeast, and the evidence shows that, were it not for the yeast, the balling at the end of the operation would be 1° less than is indicated. Whether or not there is an increasing rate of feed, it seems fair to conclude that there is a substantial constancy of concentration.

 Infringement of the patent is denied by the defendant. In the first place, it is urged that there is no proof in the record to show that, as the result of this process, substantially all of the alcohol is assimilated by the yeast. On the contrary, the evidence before the master showed that at times the defendant deliberately regulated its process so as to produce alcohol for its vinegar plant. But this intentional variation of the invention does not relieve the defendant. The plaintiff has demonstrated in its factory that yeast may be produced without alcohol under the patent, and it can hardly be claimed that the defendant is released from the charge of infringement by inefficient use of the plaintiff's invention. Gibbs v. Triumph Trap Co. (C. C. A.) 26 F.(2d) 312.

Secondly, the defendant contends that it did not add the reserve to the initial part of the wort, but used a divided feed; that is to say, the nitrogenous nutriment furnished in the form of inorganic salts was added partly at the outset to the dilute portion of the wort, while the balance was withheld and fed in at hourly intervals. The table above set out of the materials which entered into the composition of the several mashes of the defendant shows that, in mash 245, there was used, as one source of the nitrogenous nutriment necessary for the yeast, 195 pounds of ammonium phosphate and 195 pounds of ammonium sulphate. The ammonium phosphate was added at the beginning of the process and the ammonium sulphate in eight portions, as indicated. Hence it is said that there was no infringement of that element of the claims which provides for the substantially continuous addition of the more concentrated wort containing all essential ingredients to the more dilute wort during the period of propagation.

Defendant's expert testified that it was helpful in the propagation of yeast to have a high nitrogen sugar ratio at the beginning of the period of propagation. It was calculated that in mash 1901, which is similar in composition to the mash under discussion, the nitrogen sugar ratio was 100 parts of sugar to 6.36 parts of nitrogen, while the corresponding ratio in the Hayduck patent was 100 parts of sugar to 2.5–3 parts of nitrogen. It may be assumed that these figures are correct, and that some advantage is derived from giving a certain fillip to the growth of the yeast at the beginning by supplying it with a relatively large quantity of nitrogen. It may also be admitted that the hourly additions during an eight-hour period of one of the ammonium salts indicate, as far as they go, an interrupted rather than a continuous addition of the nutriment. Nevertheless it does not follow that infringement of the patent by this variation of the process has been avoided. A substantial part of the nitrogenous nutriment was contained in the cereals, which not only entered into the dilute, but also into the concentrated portion of the wort, and these were admittedly added substantially continuously throughout the period of propagation, together with other essential yeast food. The Hayduck process was therefore followed by the defendant. The variations indicated, even though useful, cannot alter the fact that the feeding process, considered as a whole, was substantially continuous. Infringement of the patent by the mashes in question is made out.

It is admitted that mash 1094 was an infringement of the patent. The ingredients and the procedure were similar to those employed in mash 245, with the exception that no ammonium salts were used as sources of nitrogen, and consequently there was no separate addition or divided feed in any respect. The evidence shows, however, that this was an exceptional mash and was used only on two occasions for the manufacture of seed yeast.

Mash sheet 1901 sets out the process of the defendant which has been continuously in use since 1926, displacing the procedure above described. The nutritive material is

divided into two separate worts, and a feeding process, admittedly continuous in some respects, is adopted. The plaintiff contends that mash 1901 adopts and follows all of the essential features of the manipulative process disclosed by patent 105 and consequently infringes it. The defendant, on the other hand, contends that the general principle of a divided wort and the addition of one part to the other did not originate with Hayduck, but was shown many years before by Rainer, and that infringement of the patent in suit can be made out only if it appears that the defendant is following those steps of the invention which distinguish it from the Rainer disclosure. The defense is that mash 1901 follows the procedure of Rainer and not that of Hayduck.

It is desirable in this connection to refer again to the references to Rainer in the Hayduck patent and to the details in which the patentee showed that his disclosure was to be differentiated from the art of record. In the first place, Hayduck directed the preparation of a dilute nutrient solution containing all essential yeast nutrients. He said in his specification in so many words that a wort should be prepared according to the procedure commonly followed in the compressed yeast industry. He contrasted the simplicity of this process with the preparation by Rainer of separate worts, called the "peptone wort" and "sugar wort," respectively, which were not mingled together at the outset of the process, but kept separate for subsequent addition. Next Hayduck differentiated his procedure from Rainer's by showing that, after the dilution of a small portion of his wort, the addition of the more concentrated part was made substantially continuously during the period of propagation of the yeast. He again contrasted the simplicity of this plan with that of Rainer, saying that Rainer added the peptones continuously and the sugar at intervals as required. In other words, Hayduck pointed out, not only that in Rainer the materials were separately added, as contrasted with a unitary stream, but also that a part of the materials, to wit, the sugar, was added at intervals and not with substantial continuity. Bearing these distinctions in mind, it is necessary to examine the steps of the procedure of mash 1901 in order to ascertain whether it follows Rainer, as claimed by the defendant, or Hayduck, as contended by the plaintiff.

The raw materials in this mash were molasses, cereals, and inorganic ammonium salts. The cereal materials on the one hand and the molasses on the other were treated separately to make two worts, the first of which the defendant calls "peptone wort" and the other "sugar wort," obviously in similitude with the nomenclature of the Rainer patent. The peptone wort was prepared by mashing the cereal materials and the sugar wort by diluting, acidifying, heating, and filtering the molasses. A portion of the wash waters from the cereal mashing operation, which consisted in effect of a diluted portion of the peptone wort, was placed in the vat, and there was added seven liters of aqua ammonia, nine gallons of the sugar wort and all of the ammonium phosphate. At the beginning the liquid had a high dilution indicated by a balling of .8°. It contained about six per cent. of the total sugars and had a volume of 5,500 gallons.

Propagation of yeast was commenced in this dilute portion of the peptone wort and aeration was employed. From the end of the first hour to the end of the thirteenth hour there was a slow and continuous addition of the peptone wort at an increasing rate. During the greater part of the same period, namely, from the end of the second hour to the end of the fourteenth hour, additions of the sugar wort were made at intervals so frequent that the addition may be considered practically continuous. On the mash sheet, the additions of peptone wort are shown on the left, and the additions of sugar wort on the right-hand side. It there appears that the feeding of the peptone wort was divided into four periods of three hours each. During the first period the peptone wort was added at the rate of one gallon in each 100 seconds; during the second at the rate of one gallon in 50 seconds; and during the third and fourth periods, at the rate of one gallon in 28 seconds. The amounts added during these respective periods were 108, 217, 380, and 381 gallons, respectively. Corresponding with this addition of the peptone wort, there was an addition of the sugar wort at rapid intervals of 15 minutes. The period of addition was likewise divided into four intervals of three hours each. During the first interval 3.3 gallons of sugar material were added every 15 minutes, making a total of 39 gallons; during the second interval 6.6 gallons every 15 minutes making a total of 78 gallons; during the third period 10.7 gallons every 15 minutes, making a total of 129 gallons, and during the fourth or last period, 12 gallons were added every 15 minutes, making a total of 144 gallons. From these figures it is obvious that the ratio of sugar material to peptone material was substantially con-

stant throughout the periods of addition of the respective worts.

The defendant also used in mash 1901, as in its earlier mashes, a different method of adding the ammonium salts. This material is included with all other essential ingredients in a single wort in the Hayduck process, but in the defendant's mashes a part of the ammonium salts, to wit, all of the ammonium phosphate, was placed in the vat at the outset, together with the initial dilute solution of the peptone wort. The ammonium sulphate was added in three gallon lots at twelve hourly intervals beginning with the third and ending with the fourteenth hour.

The defendant attempts to distinguish this procedure from that of the patent in suit in several particulars. It is urged that Hayduck had reference to the usual grain wort employed in 1914 and 1915, whereas mash 1901 is not composed of grain exclusively, but contains about one-third grain and two-thirds molasses, with ammonium compounds. The patent, however, relates to procedure rather than the composition of the mash. The claims are not limited to grain materials, and it is obvious that infringement cannot be avoided by substituting for the usual wort mentioned by Hayduck in his illustrative example a wort of a composition which under the present practice has been found more efficient.

In the next place, the defendant contrasts the dilution of Hayduck, which has a balling of about 1°, with the concentration of the dilute portion of the peptone wort of mash 1901, which had a balling of .8°. Here again the point is insignificant because the claims of the patent are not limited to a particular balling but provide for the initiating of propagation in a dilute nutrient solution, a phrase which is descriptive of the concentration of the mash under discussion.

In the third place, the defendant points out that Hayduck employed the usual ratio of sugar to nitrogen, to wit, 100 parts of sugar to 2⅓–3 parts of nitrogen, whereas the corresponding ratio of mash 1901 was 100 parts of sugar to 6.36 parts of nitrogen, and also that the defendant did not add the ammoniacal nitrogen with susbtantial constancy. This contention has already been discussed above in considering the other mashes of the defendant.

Finally the defendant points out that, whereas the Hayduck reserve wort is added in a single stream and with substantial constancy to the diluted wort, the defendant in mash 1901 divides the materials to be added into two separate portions of different composition and adds one continuously and the other at intervals. Certain additional minor differences, as indicated, are as follows: The addition of the peptone wort begins at the first and ends at the thirteenth hour, whereas the addition of the sugar wort begins at the second and ends at the fourteenth hour. The peptone wort is added in a continuous stream, whereas the sugar wort is added at rapid intervals. The evidence is not clear as to the length of time consumed by the introduction at each fifteen-minute interval of a portion of the sugar wort, but it would seem that the time of flow does not exceed two or three minutes. A further minor difference is the fact that, although the proportion of peptone to sugar material, when the additions are considered as a whole, is relatively constant, the rate of addition of the peptone during the third and fourth intervals is the same, whereas the rate of addition of the sugar wort increases from the third to the fourth interval.

The query is whether all of the differences that are pointed out amount to such a substantial departure from the Hayduck procedure as to avoid infringement of the patent. It is of course obvious that infringement may not be avoided by separating the essential materials into two or more parts and then running them into the vat simultaneously in separate streams. The defendant has not adopted this precise procedure, but it has approximated it. It is not seriously contended that the frequent addition of sugar material at short intervals is materially different from the continuous addition thereof. It has not been shown that the interrupted as distinguished from the continuous addition served any good purpose in the defendant's scheme. A certain flexibility is of course possible, when the sugar is separated from the peptone material, whereby the rate of addition of the respective constituents may be varied during the period of growth if desired. As a matter of fact, no variation during propagation was made by the defendant and none would seem to be necessary, since the action of known materials after experiment could be definitely foreseen. It is difficult to resist the impression that the real purpose of the interrupted additions of the sugar material in mash 1901 was the creation of a superficial distinction from the Hayduck process and a superficial similarity to the process of Rainer. The fact is, however, that the defendant has carefully avoided the interrupted additions of sugar material in the Rainer process at three-hour intervals, and has approximated very

closely the continuous flow of Hayduck. There is less to be said as to the difference in the periods during which the peptone and sugar worts are flowed into the vat. In short, the conclusion is that the treatment of the materials in mash 1901 is the substantial equivalent of the Hayduck method, and constitutes infringement thereof.

## Patent 106.

It will be recalled that, in the prior litigation between the parties, patent 103 was found valid and infringed. This patent covered a process for making yeast which comprised a nutrient solution containing essentially sugar material and yeast nourishing inorganic salts, and, during the period of propagation, neutralizing the deleterious excess of acidity liberated. Patent 106, which is now to be discussed, speaking broadly, discloses a combination of the process of patent 103 with the Zulauf or adding process of patent 105. Referring to the last-mentioned process, the specification of patent 106 contains the following description of the invention:

"In the process described hereinafter, which constitutes the subject matter of my present invention, this peculiar distribution of the nutrient liquid is applied to worts, which are prepared principally from sugar or sugar containing substances (for example molasses), and inorganic salts. In the production of yeast from such sacchariferous solutions, containing mineral salts as yeast nutrients, the difficulty has hitherto always been encountered that the yeast cannot stand such high salt concentrations as are required for its full nourishment in yeast nutrient solutions of heretofore usual sugar content, and that it was therefore necessary, to work either with greatly diluted nutrient liquids or solutions, or with solutions containing a disproportionately small quantity of inorganic yeast-nutrient salts. The latter procedure, however, results in corresponding small yeast yields because of the deficiency of yeast essential substances or elements for which the yeast was dependent upon the inorganic salts."

The patentee then declares that, by using the process of "adding" "there is not only avoided an accumulation of alcohol, but also deleterious accumulation of nutrient salts is avoided, as the salts, as well as substantially all resulting alcohol which may be formed, are immediately assimilated by the yeast."

"For the preparation of the nutrient solutions, there are used, for instance, sugar and yeast nutrient inorganic salts (ammonium, potassium and magnesium combined with phosphoric acid, sulphuric acid, etc.). This process permits of the use of the salts in a proportion up to half as much total salts as sugar. When using ammonium sulphate as a nitrogen source, the rapid assimilation of the nutrient salts supplied for the yeast can be recognized by the surprisingly great increase in acid content (sulphuric acid ions set free) in the nourishing liquid. The deleterious excess of this liberated acid can be eliminated by the addition of alkalies or salts having an alkaline reaction in accordance for example, with the process of my copending application for United States Patent Serial No. 420.830" (indicating patent 103).

Two illustrative examples are given, in one of which 100 parts of sugar are used with 40 parts of ammonium sulphate, 9 parts of acid phosphate of potassium, one part magnesium sulphate, to which is added about 30 parts calcium carbonate for neutralization. In the other example, 100 parts of molasses, containing 50 per cent. of sugar, are used, together with 10 parts of ammonium sulphate, 10 parts of superphosphate, .5 magnesium sulphate to which is added about 4 parts calcium carbonate. The materials are dissolved in sufficient water so that the sugar content amounts to 10 per cent. of the solution. The seed yeast is added to a solution of $1°$ Balling, which also contains a proportionate part of nutrient salts, and thereafter the 10 per cent. solution is slowly and continuously added.

The claims relied upon by the plaintiff are claims 1, 3, 4, 5, 6, 8, 12, and 13. The typical claims 3, 4, and 12 are as follows:

"3. A process of preparing yeast with a relatively low yield of alcohol which comprises suspending seed yeast in a non-toxic aqueous liquid, aerating the liquid, and substantially continuously adding thereto sugar material and yeast nourishing inorganic salts at a rate such that the concentration of the aerated liquid does not arise above that at which substantially all of the alcohol which may be formed is assimilated by the yeast.

"4. A process of propagating yeast with a relatively low yield of alcohol which comprises suspending seed yeast in a non-toxic aqueous liquid, aerating said liquid, substantially continuously adding thereto sugar material and yeast nourishing inorganic salts from which components are liberated which tend increasingly to acidify the solution during propagation, which addition is at a rate such that the concentration of the aerated liquid does not arise above that at which

substantially all of the alcohol which may be formed is assimilated by the yeast, and during the period of propagation neutralizing the deleterious excess of such acidity."

"12. A process of propagating yeast with a relatively low yield of alcohol which comprises initiating propagation of yeast in a dilute nutrient solution comprising essentially sugar material and yeast nourishing inorganic salts, aerating the solution and adding thereto, substantially continuously during the period of propagation, a solution containing sugar material and yeast nourishing inorganic salts at a rate such that the concentration of the solution in which the yeast is propagating is maintained substantially constant."

Claims 3 and 12 may be classed together, since they omit the neutralization feature of patent 103. They apply the process of patent 105 to a mash comprising sugar material and yeast nourishing inorganic salts. Claim 3 corresponds to claim 4 of patent 105, and claim 12 to claim 10 of patent 105, differing only in each case in that patent 105 applies to yeast mashes generally, while patent 106 is limited to the kind of mash described in its claims.

Claim 4 of patent 106 is typical of a class of claims of greater practical importance. It applies the Zulauf or adding feature of patent 105 to a mash of sugar material and yeast-nourishing inorganic salts, neutralized in accordance with the process disclosed in patent 103.

### Validity of Patent 106.

It is difficult to discern a patentable advance in claim 3 of patent 106 over claim 4 of patent 105, or in claim 12 of patent 106 over claim 10 of patent 105. It is also hard to discern invention in claim 4 of patent 106 over the disclosures of patents 103 and 105. It should be borne in mind that all of these patents were issued under the Nolan Act (35 USCA §§ 80–87) and are entitled to the effective dates of the corresponding German applications filed in 1915 as follows: Patent 103 on March 15; patent 105 on March 16; patent 106 on March 19—and that hence patents 103 and 105 are both prior to patent 106. Having these considerations in mind, the defendant assails the validity of all the claims of patent 106 substantially as follows:

It is admitted that a distinction exists between the case of copending applications by the same inventor and similar applications by different inventors. If the earlier patents in this suit had been issued to an inventor other than Hayduck, the later patent would have been invalid under the ruling of the Circuit Court of Appeals in the prior litigation, 13 F.(2d) 570, wherein the Nilsson and Harrison patent 127 was held to be anticipated by the Hayduck patent 103 because the latter broadly covered all processes for yeast making, which include the use of sugar material and an inorganic ammonium compound with neutralization, whereas the former merely applied this process to one kind of sugar material and one kind of inorganic ammonium compound. When patents of different inventors are copending, the later is invalid if its subject-matter is disclosed either in the specification or claims of the prior patent. Alexander Milburn Co. v. Davis Bournonville Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651. But, if the copending patents are applied for by the same person, it cannot be said that the patentee of the second patent was not the first inventor, and there is no dedication to the public of the unclaimed subject-matter by the issuance of the first patent. The disclosure of the first patent will not defeat the later one, provided that the subject-matter of the later patent involves a different patentable invention from that described in the claims of the earlier patent. The subject-matter of patent 106 did not involve a patentable invention different from those claimed in the two prior patents, and hence the patent is invalid. Moreover, there is a double patenting in this case, because there was a subsequent patenting of a disclosure which was dependent for patentability upon inventions previously claimed.

The authorities do not sustain the defendant's conclusion. It has been held that, in the case of copending applications by the same inventor relating to the same art, it is not necessary to the validity of the claims of the later application that they should embody a patentable advance over the earlier disclosure. The test is not whether the step between the earlier and later claims required invention. It is sufficient that the claims are for separate inventions. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (C. C. A.) 22 F.(2d) 259, 260. As was said by Judge Denison in Sandy MacGregor Co. v. Vaco Grip Co. (C. C. A.) 2 F.(2d) 655, 656:

"It seems to us to be beyond dispute, upon the principles involved, that, if the combination $a\ b\ c$ when first made by the patentee was invention, and if the addition of the element $d$ adds utility, even though of itself it would not involve invention if compared with the earlier invention of $a\ b\ c$ by some one else, yet the patentee is entitled to claims

upon *a b c* and upon *a b c d,* and the validity of the second claim may rest, in part, upon its inclusion of the invention more broadly stated in *a b c.* Most naturally these claims would appear as generic and specific in the same patent; but, if the rules of 'the Patent Office require, or if the patentee desires and the rules of the Patent Office permit, the issue of separate patents to the same inventor, and they are issued the same day, it cannot be said that the one which bears the earlier application date or issue number is part of the prior art as against the other one—always assuming that 'prior art' is a matter not touching dedication or double patenting. This was the conclusion we reached upon a discussion of the authorities in Higgin Co. v. Watson, 263 F. 378, 385, and even in a case where the patents were not simultaneous. The order of their issue was not important in that case save as to the question of double patenting."

See, also, Montgomery Ward & Co. v. Gibbs (C. C. A.) 27 F.(2d) 466; Toledo Scale Co. v. Computing Scale Co. (C. C. A.) 9 F.(2d) 823; Deister Concentrator Co. v. Deister Mach. Co. (C. C. A.) 263 F. 706; Theroz Co. v. United States Industrial Chemical Co. (D. C.) 14 F.(2d) 629, 639.

It is clear that the claims of patent 106 are not the same as the claims of the prior patents. Some of the claims of patent 106 contemplate the application of the Zulauf feature of patent 105 to a special kind of mash, and other claims of patent 106 involve a combination of the important features of patent 103 with those of patent 105. Neither of the earlier patents lays claim to a process which involved the use of the feeding process of one patent together with the neutralization of the other.

■ These considerations also dissipate the charge of double patenting. This defense is available when the claims of the two patents are the same and when the inventor's first patent cannot be practiced without infringing the claims of the second, and the second patent cannot be practiced without infringing the claims of the first. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (C. C. A.) 22 F.(2d) 259, 262; Fox Typewriter Co. v. Corona Typewriter Co. (C. C. A.) 282 F. 502, 507, 508. In the case at bar, patent 103 may be practiced without infringing patent 106, and likewise patent 105 may be practiced without infringing patent 106.

■ The defendant also assails the validity of all of the claims of patent 106 on grounds that involve a consideration of the scope of the patent. The defendant's position is that the patent should be construed as excluding mashes of which cereals are a substantial ingredient, and contends that it does not infringe the patent when so construed. On the other hand, the defendant claims that, if the patent is to be broadly construed as to cover not only mashes consisting of sugar or molasses, but also grain mashes, then it is invalid in view of the disclosures of the prior art. For the narrower construction, the defendant relies in part upon the contrast expressed in the specification of the patent between a yeast wort of normal quality, which was contemplated in patent 105, and the application of the adding process of that patent to a wort prepared principally from sugar or sugar containing substances and inorganic salts, which patent 106 was designed to cover. But it is obvious that what the patentee had in mind was the contrast between the cereal worts, composed exclusively of inorganic material, which were customarily employed prior to the year 1915, when the application for the patent was filed in Germany, with worts in which nitrogenous material was furnished in substantial quantities in the shape of inorganic salts. The same breadth should be given to patent 106 as is accorded to patent 103, to which it refers. The scope of the latter patent was considered in the opinion of this court upon the exceptions to the master's report in the accounting proceedings, and reference may be had thereto. The process is not limited to worts which contain only sugar or molasses, as sugar material, but covers also worts in which the sugar material is secured from cereal sources.

The main defense to patent 106 is a denial of infringement, even if the patent is accorded the broad scope to which, as we have seen, it is entitled. But, before considering the question of infringement, it is desirable to consider briefly the defendant's claim that the disclosures of the Rainer patent, already considered in connection with patent 105, likewise invalidate patent 106. It is not asserted that Rainer disclosed the neutralization feature of patent 106, and hence the contention is limited to those claims of the patent of which claims 3 and 12 are typical. The defendant contends as to these claims that Rainer showed, not merely the Zulauf feed, but also applied it to a mash containing substantial quantities of inorganic salts. Since it has been determined that the manipulative feature of patent 105 was not disclosed by Rainer, no further general discussion of this point need be given; but it may be worth while to consider briefly the claim that Rain-

er's patent disclosed a mash which consisted in part of inorganic ammonium salts. An earnest effort was made by the defendant to establish this position, in the course of which considerable expert testimony was taken, the point of which may not be entirely clear to those who may be called upon hereafter to examine the mass of material in the record without a word of explanation.

The contention of the defendant is that inorganic salts are created in the peptonization of the cereals in the Rainer process. Peptonization takes place upon the addition to the mixture of diastase in the form of malt or malt sprouts and the treatment of the mash with lactic, phosphoric, or sulphuric acid, or all three acids combined. Whether Rainer intended the use of only one acid, or all three, was the subject of much difference of opinion at the trial, which was occasioned chiefly by reason of the lack of clarity in the patent. The acid treatment causes the degradation of complex albuminous substances into more simple yeast assimilable materials. Certain amids present, particularly asparagin, when treated with acids, undergo hydrolysis. Ammonia is formed and combines with the mineral acid or acids present to produce inorganic ammonium salts. Some ammonium compounds are also formed in the mashing process which precedes the acid treatment.

In order to ascertain the amount of the ammonium salts produced, the defendant's expert analyzed an infusion, made in the course of an experiment, in which malt sprouts were treated under the Rainer process, as the defendant understands it. That some quantity of ammonium salts was formed in the operation was not questioned, but there was a sharp difference of opinion amongst the expert chemists as to whether the precise quantity was measured by the analytical methods employed. In view of the conclusions reached herein as to the Rainer patent, it is not necessary to decide this issue. Even if it be true that Rainer applied his process to a mash in which substantial quantities of inorganic salts were produced, it avails the defendant nothing, since Rainer's adding process did not anticipate that of Hayduck. Moreover, one cannot say that Rainer disclosed or even knew that inorganic ammonium salts were developed in his treatment. No mention of the subject appears in the patent. The eminent chemists who appeared as experts in this case were agreed that the precise composition of the materials, and the reactions between them, which may be expected in the peptonization

of a yeast mash, are not yet known with precision. Much less would be expected of one who was merely a skilled worker in the art. Rainer did not suggest in any way that deleterious acidity developed by mineral salts, when added as such to the peptonized cereals of the mash, could be offset by his process. Furthermore, the defendant does not contend that Rainer disclosed the neutralization step in the patent under discussion. The only reference in the Rainer patent to neutralization is the statement that, after one or more of the acids mentioned are employed in the peptonization of the mash, they should be neutralized with soda or by saturating the liquid with basic phosphate of lime. It is nowhere indicated in the patent that mineral salts may be added to the mash during propagation and that the resulting acidity may be neutralized. The defendant indeed did not cite the Rainer patent in the first trial, and does not cite it now in anticipation of the practice of neutralization which is so important an element of patent 103 and patent 106.

### Infringement of Patent 106.

### Neutralization.

It was the view of the patentee that the acid problem arising in the use of inorganic salts as a source of nitrogenous nutriment, with which the prior litigation between the same parties was so much concerned, arises also in dealing with the worts covered by patent 106. Thus it is stated in the specification:

"When using ammonium sulphate as a nitrogen source, the rapid assimilation of the nutrient salts supplied for the yeast can be recognized by the surprisingly great increase in acid content (sulphuric acid ions set free) in the nourishing liquid. The deleterious excess of this liberated acid can be eliminated by the addition of alkalies, etc. * * * in accordance with the process of my copending application for Patent No. 103."

The character of this reaction need not be further discussed other than to say that in such a case, the yeast consumes the ammonium radical, and sulphuric acid is set free which all agree is deleterious to the yeast.

Claim 4, above set out, is typical of the claims of the patent which include this feature. It is the contention of the plaintiff that the defendant, in all of the mashes except 1094, in which no ammonium salts were used, met the acid problem by neu-

tralization and thereby infringed the neutralization claims of patent 106. The mashes involved are 245, 420, 668, 1368, and 1901. The defendant admits that it employed a well-known neutralizer in each of the first three mashes, to wit, 245, 420, and 668. Mash 245 included both cereals and molasses. The mash sheet in this case, as in all others, contains a column headed "Acidity" under which appears at hourly intervals figures indicating the titration of the mixture as measured by the defendant. The titration scale was based upon the number of cubic centimeters of one-tenth normal alkali needed to neutralize 50 cubic centimeters of the solution. This method gives some measure of the acidity, but does not definitely show the hydrogen ion concentration, of which some discussion hereinafter appears. It is, however, the sort of test which has been used by yeast manufacturers for many years, and does furnish a valuable indication of the presence of deleterious acidity of the mash, especially when the operator has had experience with the materials employed.

The mash sheet for 245 contains a record of the titration figures from hour to hour during the course of the continuous feeding process. At the bottom of the sheet is the admonition to add 5 liters of ammonia if the acidity is over 4.5, and 10 liters, if over 7. The sheet also shows that during the course of the period of propagation, there were twelve additions of aqua ammonia, which were made as directed.

It appears that in this mash, according to the testimony of the defendant's expert, an unusually large amount of inorganic salts were employed. While the amount does not appear to exceed that employed with mash 1901, it is larger than in any of the others. It was stipulated in the case that mash 245 was one of a group of varying ingredients, but alike in including cereals, molasses, inorganic ammonium salts, and a neutralizing agent, from which the defendant made approximately 1,600,000 pounds of yeast, during the period covered by the accounting proceedings upon the patent 103.

Mash 420 contained no molasses, but consisted of cereal materials together with inorganic salts. The amount of materials was relatively small. The mash sheet shows that, on three occasions during the period of propagation, five liters of aqua ammonia were added when the titration figures indicated an increase in acidity.

Mash 668 was also relatively small in quantities of material. Like mash 420, it contained no molasses, but was composed mainly of cereals and inorganic ammonium salts. On two occasions during the period of propagation, 10 pounds of chalk were added when the titration figures indicated that the acidity had increased.

It is admitted by the defendant that the aqua ammonia and chalk employed in these worts are well-known neutralizing substances, and that they tended to neutralize the acidity of the mashes in which they were employed. But it is contended that the acidity so neutralized was of an organic character, and that, notwithstanding the use of inorganic ammonium salts, no free mineral acid was released. The explanation given is that mashes composed of cereals, or of molasses and cereals combined, contain certain substances, which have been designated as buffering materials, the effect of which is to prevent the formation of deleterious inorganic acids in the mash. This position of the defendant is seemingly at variance with that which it maintained in the litigation over patent 103. Its leading expert in the present trial was also one of its experts in the former trial, which took place in 1924. It was then conceded that in the defendant's process, wherein an all-molasses mash, together with ammonium salts was used, deleterious acidity was produced which the defendant was obliged to offset by the use of a neutralizer. But the defendant now claims that, in the mashes under discussion in this case, a different condition arose because the mashes were composed either of cereals only or of molasses with large additions of grain, and that in such mashes the buffering materials are so great that a neutralizing agent is not needed.

The available information as to the nature of the buffering materials is not very definite. They are said by the experts to consist of certain salts of weak organic acids and certain amino acids which have the effect, at least in part, of offsetting the deleterious mineral acidity in the wort. The salts of organic acids present are for the most part potassium and sodium salts, which are broken up in the presence of inorganic acid, so that corresponding salts of the inorganic acids are formed and weak organic acids are set free. The amino acids are complex nitrogenous materials which possess some of the characteristics of acids but which act in the presence of inorganic

acids as bases or neutralizing agents. So far the experts on the opposite sides in this case are agreed. But there is some difference of opinion between them, not very sharply defined, as to whether the amount of buffering materials in molasses is equal to that in grain; the plaintiff's expert being of the opinion that molasses is richer in buffering materials than grain, and the defendant's expert being of the contrary opinion. There is a very sharp and well-defined difference of opinion between the parties as to whether the amount of buffering materials either in grain or in molasses is sufficient to overcome the released mineral acidity in the mashes. This issue is the most important one involved in the question of infringement of patent 106, for, if the materials used in the defendant's mashes do not contain inherently sufficient buffers, and resort to neutralizing substances must be had, there is little doubt that infringement of patent 106 has taken place.

This issue of fact arises, not only in considering infringement of patent 106, but also in regard to infringement of patent 103. It will be therefore necessary to consider the testimony in some detail, and what will be said is designed also for use in connection with the opinion in the accounting proceedings over patent 103 filed simultaneously herewith. The defendant's expert testified in the trial of patent 106 that, when the defendant conceded the necessity for a neutralizer in an all-molasses mash in the former trial, his information on the subject of buffering materials was not as full as it subsequently became. How or when he made the discovery was left quite uncertain, except that it occurred in the interval between October, 1924, when the first case was tried, and the subsequent litigation between the same parties over the same patent in Canada which took place in 1926. He was still uncertain at the time of the second trial as to whether the concession in the first trial should have been made. He admitted that, if a mash is composed of sugar, which is pure or nearly pure, together with inorganic salts, harmful acids will be quickly produced and the prompt use of neutralization required; but he said that, if molasses is used, it is unlikely that harmful acidity will be produced so long as the results are present only in moderate amounts.

The uncertainty of this testimony was sharply called to the attention of the parties by the court during the trial. An inquiry was made as to whether the defendant had analyzed chemically the materials employed in its mashes in order to ascertain with precision whether inorganic acids would develop; or whether the defendant had made a test of the hydrogen ion concentration of such materials when used without a neutralizer. It then transpired that such an analysis was somewhat difficult to make, and no proof of any experiment, in regard to the hydrogen ion concentration was offered to the court. Some experiments on this line were performed by defendant's expert and used in the evidence before the master in the accounting proceeding. When the exceptions to this report were argued before the court, it was noticed that the experiments in question had not been put in evidence in the second case when the parties were considering the same problem of acidity under patent 106, whereupon defendant's counsel very frankly stated that there were such variations between the experiments in question and the factory processes of the defendant, that the tests afforded little if any support to the defendant's argument. The master reached the same conclusion.

It is obviously a most important and significant circumstance that the defendant, whilst contending that neutralizers were not necessary in the kind of mashes under consideration, nevertheless employs them. The explanation of this inconsistency was not satisfactory. Nor was a convincing explanation made of the fact that the defendant on all of its mash sheets made a careful record from hour to hour of the titration figures. The expert declared that the titration figures were tabulated because, if one does not give the operator "some records to keep, he will go to sleep on you." He also suggested that the aqua ammonia added to mashes 245 and 420 had some food value, but admitted that for this purpose it was no better and no worse than other ammonium compounds which have no neutralization value. With regard to the employment of chalk, a well-known neutralizer, in mash 668, the expert said that "the use of chalk was merely the fancy of the yeast maker." The evidence before the master showed that the defendant's factory operations had been in charge of an industrial chemist, who directed that a neutralizer be employed during the accounting period. This chemist, however, was not produced as a witness in the case. During the same period the defendant's expert was employed from time to time in a consulting capacity.

The evidence is quite vague as to why the practical chemist in charge of manufacturing operations was permitted unnecessarily to continue the use of neutralizing agents. After the decree of the court in the first case on May 9, 1925, the defendant abandoned the use of aqua ammonia and chalk as a neutralizer, but, in place thereof, and acting under the advice of its expert chemist, adopted the practice exemplified by mashes 1368 and 1901, hereinafter discussed, wherein aqua ammonia was introduced into the vat before the propagating operation, with result that harmful mineral acidity would be neutralized if developed in the mash from mineral salts during the subsequent period of propagation.

When all of these circumstances are taken into consideration, the conclusion that neutralizing substances were used with deliberate purpose seems to be inevitable. The litigation between the parties has been constantly going on since the year 1923, and, during this long period, there is no instance in which mineral salts have been employed in the defendant's mashes without the accompanying use of some kind of neutralizing substance. The gist of patent 103 was in the minds of the parties during the entire controversy. The importance of showing the presence of buffering material was emphasized by a number of experiments which defendant's expert undertook to perform in order to demonstrate the validity of his opinion. How simple it would have been to have conducted the factory operations of the defendant for some material length of time during the period mentioned without using a neutralizer or equivalent substance, and to have demonstrated thereby that yeast could be efficiently and economically made without it. One is forced to conclude that, by the weight of the evidence, deleterious acidity was developed both in the mixed and grain mashes, and that neutralizing agents were purposely employed to offset the harmful effect. Moreover, it is fair also to reach the conclusion of fact that the buffering materials in molasses are found in as great an amount in cereal grains.

All of this ground was thoroughly gone over during the long-continued taking of testimony in this case and in the exhaustive oral arguments of counsel, at the conclusion of which it was reasonable to suppose that all of the light which the defendant possessed had been thrown upon the subject.

A new argument, however, was advanced in the written briefs, which was not touched upon by the expert witness or counsel prior thereto. This belated effort consists of an attempt to ascertain from certain illustrative examples in the Wohl patent, hereinbefore mentioned, and also from certain examples in patent 106, the precise amount of buffering material in worts composed of grain or of molasses, together with inorganic ammonium salts.

The Wohl patent contains several examples which are illustrative of the process disclosed. In the first example he describes a usual cereal wort composed of 40 per cent. malt sprouts, 20 per cent. grain malt, and 40 per cent. maize or corn, comprising a total mash of 100 one hundred weight. He employs such material, except that he substitutes for three-fourths of the malt sprouts, nitrogen in the form of ammonium salts, for example, 150 kilograms of ammonium sulphate. He states that no neutralizing agent is used, for it is possible to obtain desirable results without it. In his second example, he not only substitutes inorganic salts for a considerable part of the organic nitrogen contained in the malt sprouts, but also omits a considerable part of other cereals containing sugar material; and in this case he finds it desirable to neutralize at least a substantial part of the acidity which is formed. It may be noted in passing that example 1 was in the original German application of Wohl and preceded Hayduck's German counterpart of patent 103, and that example 2, employing neutralization, was not added to the patent disclosure until after Hayduck's priority date.

The defendant points out that, in Wohl's first example, the mash is composed of the same sort of materials as in the defendant's mashes; and that the rate of salts to cereals is as follows: 4.3 pounds of ammonium sulphate to every 100 pounds of grain. Hence the defendant concludes that the buffering material in 100 pounds of grain is sufficient to take care of all of the harmful acidity released by 4.3 pounds of the ammonium salt.

A similar calculation is made in regard to the materials specified in the two examples which appear in the specification of patent 106. In the first example, 40 parts of ammonium sulphate are used to 100 parts of sugar together with 30 parts of calcium carbonate, the neutralizer; that is to say, one part of neutralizer to 1.33 parts of the salt. In the second example, there are em-

ployed 10 parts of ammonium sulphate to 100 parts of molasses (equivalent to 50 parts of sugar) together with 4 parts of the neutralizer. The defendant contends that these figures show that, when sugar, which contains little or no buffering material is used, it is necessary to employ one part of neutralizer to take care of 1.33 parts of salt; hence it follows that the 4 parts of neutralizer used in the second example will take care of 5.32 parts of the salt, and since 10 parts of the salt were used in this example, the remainder of the salt, to wit, 4.68 parts, must have been taken care of by the buffering material inherently present in 100 pounds of molasses.

The defendant then applies its conclusions to the several mashes under consideration, using the factor 4.68 to ascertain the buffering power of the molasses employed and the factor 4.3 to ascertain the buffering power of the cereals used. In passing, it may be noted that the defendant concludes that there is a greater quantity of buffers in molasses than in grain. The results may be tabulated as follows:

In mash 245, the combined buffering power of the molasses and cereals is sufficient to take care of 299.3 pounds of ammonium sulphate, and, since the total amount of ammonium salts used was 200 pounds, there was an excess of buffering power of 49.7 per cent.

In mash 420, consisting of cereals only, there was sufficient buffering power to take care of 154 pounds of ammonium sulphate, and, since the total amount of the salt and its equivalent used in the mash was 101.5 pounds, there was an excess buffering power of 51.8 per cent.

In mash 668, in which no molasses was used, there was a buffering power sufficient to take care of 159.1 pounds of ammonium sulphate, and, since the total amount of salt equivalent was only 81.5 pounds, there was an excess buffering power of 107 per cent.

The same calculations were made with reference to mashes 1368 and 1901, to be hereinafter more fully considered.

In mash 1368, in which both molasses and grain were used, the total buffering power is enough to take care of 539 pounds of ammonium sulphate, and, since only 381 pounds of salt equivalent were used, there was an excess buffering power of 41.5 per cent.

In mash 1901, in which both molasses and grain were used, there was enough buffering power to take care of 547 pounds of ammonium sulphate, and, since the total salt equiva-

lent employed was 464 pounds, there was an excess buffering power of 17.9 per cent.

This argument is ingenious enough; but, when the conclusions to which it leads are considered, one begins to suspect that its premises are unsound. For instance, when the factor 4.68, indicating the buffering power of molasses, is applied to the mash of the defendant received in evidence in the first trial as an infringement of patent 103, it would appear that there was sufficient buffering material inherent in the molasses to take care of 280.2 pounds of salts; and, as only 100 pounds of salts were used, it would seem that there was 180.2 pounds excess buffering material at hand. In other words, the calculation would show that there was a greater excess of buffering materials in that mash than in any of the mashes of the defendant offered in evidence in the pending case. Nevertheless the defendant made use of a neutralizer in the first-mentioned process, and conceded in the former trial that a neutralizer was necessary; and, in the present case, the defendant's expert, although claiming to have gained new information since the first trial, was unwilling to state that there was sufficient buffering materials in the defendant's mash in evidence in the first trial to offset the acidity produced.

The fallacy of the argument consists in the assumption that the examples in the Wohl patent and those in patent 106 were intended to state in chemical terms a precise or exact rule of neutralization. Neither patent warrants this assumption. Wohl's first example appeared in his original specification at a time when he had no clear conception of the acidity problem. He states that, in place of a part of the organic nitrogen customarily used, it was possible to use inorganic salts to an extent of from 10 to 50 per cent. of the total nitrogen content. He found that he could use the amount of salts prescribed in the first example and obtain results satisfactory to him, without a neutralizer. But his patent sheds no light upon the yields expected, and it would appear that he was content if he obtained from his process a yield equal to that previously obtained from the more costly cereal material. If it be assumed that he obtained such a result, it does not follow that no acidity was created in the mash. It should also be borne in mind that Wohl did not increase the total nitrogen content. He merely substituted inorganic for organic nitrogen. Hence the same conditions did not prevail in his process as in the defendant's mashes, in which the organic nitrogen in the cereals is retained and considerable

quantities of inorganic nitrogen are added with resulting yields, double or triple those which Wohl secured. It is also of significance in this connection that the Wohl patent itself, by the amendments inserted after the Hayduck discovery, directed the use of a neutralizer in mashes consisting of cereal grains and inorganic salts. Similar statements may be made with equal truth of the examples in patent 106. The patent does not purport to show that the precise differences in the amount of neutralizers used in the two examples were regulated by the differences in the amount of inherent buffering material. There is no statement in the patent on the subject; and such a restriction was not essential to the validity of the patent, as the decision in the first case indicated.

In addition to the argument above set out, the defendant makes an additional point in regard to mashes 1368 and 1901. It contends that, even if there are deleterious acids formed in these mashes by the addition of ammonium salts in excess of the amount which is taken care of by the buffering materials, this excess of acidity is not neutralized during the period of propagation, and therefore the neutralizing claims of patent 106 are not infringed. It is conceded that aqua ammonia, the same neutralizing substance employed in mashes 245 and 420, is introduced in mashes 1368 and 1901, but it is not added in the same fashion or at the same point of time. In the former, as we have seen, aqua ammonia or chalk is added from time to time when the titration figures indicate a dangerous increase of acidity, but, in mashes 1368 and 1901, the initial mash is oversoured when it is made up and the neutralizing substance or the principal part of it is put into the wort before it is fed into the propagating vat.

For instance, the initial acidity of mash 1368, caused by the formation of an excessive amount of lactic acid, is indicated by the titration figure 37, whereas the initial acidity of mash 420 is 21.5, and that of mash 668 is 16.4. The formula of ingredients for mash 1368 calls for the use of 128 pounds of aqua ammonia. The mash sheets indicate that 48 liters or 96 pounds of this substance is added to the wort before it is placed in the vat, whereby the acidity of the wort is reduced to 8.8. This initial wort was divided into four portions. The mash sheets of the first and second portions seem to indicate that two pounds of aqua ammonia were introduced in the propagating vat at the beginning of the operation, and the mash sheets of the third and fourth portions indicate that six pounds of aqua ammonia were introduced in the propagating vat at the beginning of the operation.

In mash 1901, the initial acidity reached the higher point of 48.5, and this was reduced to the figure of 6 by the addition of 120 pounds of aqua ammonia. The total amount of aqua ammonia employed in the four portions into which this mash was divided was 156 pounds.

The souring process in the preparation of a yeast mash is an important part of the operation and contributes largely to the production of good quality and large yields. It helps to complete the peptonization of the materials. All of the cereal mashes of the defendant discussed in this case are subjected to this process. The chemical reaction which takes place when aqua ammonia is introduced in a mash which contains lactic acid is the formation of the ammonium salt of that acid, namely, ammonium lactate. If ammonium salts of inorganic acids, such as ammonium sulphate, are introduced into this mash to furnish nutriment to the yeast during the period of propagation, and the inorganic acid is set free, for instance, sulphuric acid in case ammonium sulphate is used, a chemical reaction takes place between the acid and the ammonium lactate. The weak organic acid radical in the ammonium lactate is supplanted by the stronger sulphuric acid and the result is that, in place of ammonium lactate, there is formed ammonium sulphate, and, in place of the free sulphuric acid, there is found in the nutrient liquid, free lactic acid. The practical result is that the inorganic acid, which is harmful to the yeast, is done away with and in its place there is substituted an organic acid which is not only harmless, but helpful, to the yeast as a nutrient.

The defendant contends that the chemical reactions thus described do not constitute a neutralization of deleterious inorganic acid. The argument is that neutralization in a strict technical chemical sense is the combination of a base or hydroxide with an acid whereby a salt is formed and the acid, as such, disappears; while, in the reactions which take place in the mashes under discussion, when the free inorganic acid comes in contact with ammonium lactate, acid does not disappear from the liquid. There is merely the substitution of one acid for another. But it was conceded that the term "neutralization" is often given a broader significance, to include the sort of reaction above described. Thus it was shown that, in the former litigation concerning patent 103, chalk or calcium carbonate was used as a neutralizer. Chemically speaking, the reac-

tion between chalk and sulphuric acid is similar to that between ammonium lactate and sulphuric acid. The calcium in the chalk combines with the inorganic acid to form calcium sulphate, and the weaker carbonic acid is set free. This reaction the defendant's expert described as one of neutralization in the litigation between the parties concerning patent 103, which took place in Canada. He contended, however, in the case at bar, that there is a substantial difference between the two reactions, because carbonic acid gas is very weak and goes off into the air, while lactic acid is one of the stronger organic acids and remains in the solution.

But the discussion need not be prolonged, for it is obvious that it would be an undue restriction of the claims of patent 106 to give to the term so strict and technical a meaning as to render easy an evasion of the patent rights. It is clear that neutralization in a very real sense takes place when the object of avoiding the effects of a harmful acid is accomplished by substituting therefor an acid which is both harmless and useful. Moreover, if the matter be considered with reference to the phenomenon involved in hydrogen ion conceneration, then it would seem that, even in a strict chemical sense, there is a true neutralization of inorganic acid. That which the yeast maker is endeavoring to avoid is such a high hydrogen ion concentration that the growth of yeast will be impeded. When free mineral acid is produced in the propagating mash, hydrogen ion concentration speedily arises, and the yeast growth is impeded; and, when the operator removes this particular acid from the infusion, substituting therefor another acid whose hydrogen ion concentration is so low that it is harmless to the yeast, there is, in a chemical sense, a removal or neutralization of the very substance whose harmful effects the yeast maker desires to avoid. The conclusion is inevitable that there is no distinction on the score of neutralization between mashes 1368 and 1901 on one hand and mashes 245, 420, and 668 on the other, and that all of these mashes infringed patent 106.

## Patent 102.

The specification of this patent states that an object of the invention is to provide a commercial procedure for yeast manufacture, and a nutrient solution adapted therefor which contains sugar material together with yeast-nourishing inorganic salts added in quantities considerably greater than theretofore used. The solution employed is maintained very dilute and adapted for propagation with aeration; the degree of dilution being such as to render the salts innocuous to the yeast. Another object is the production of compressed bakers' yeast which has good baking strength and keeping qualities.

The plaintiff relies on all of the thirteen claims of the patent except claim 3. Claim 5, which may be considered typical, is as follows:

"The process of manufacturing yeast which comprises preparing a yeast nutrient solution and propagating yeast therein with aeration, said yeast nutrient solution containing essentially sugar material and yeast nourishing inorganic salts, in amounts sufficient to supply all essential yeast foods for the yeast during the period of propagation, said salts being present in a substantial amount relative to the amount of sugar material, and the yeast nutrient solution being of an initial dilution corresponding to not more than 2° on the saccharometer, whereby the said salts are rendered innocuous to the yeast."

The disclosures of the patent are of minor practical importance, as compared with those of patents 103, 105, and 106, and have never been the subject of commercial production. The patent was issued on the same day as patent 103, which, according to its specification, discloses a more advantageous process, in that it affords twice the yield of yeast from the same amount of material, by reason of the neutralization of the acids resulting from the use of inorganic salts. Hence the process of patent 102 has never been employed by the plaintiff, but instead the process of patent 103 was adopted. This statement of the superiority of the process of patent 103 seems to reflect upon the soundness of the claims of patent 102 in so far as they broadly assert that, by means of high dilution of the wort, the salts are rendered innocuous to the yeast. The disparity of yield would seem to indicate that in the process of patent 102 all the harmful acidity is not eliminated.

On the question of invalidity, the defendant cites certain prior art references in an endeavor to show that there was nothing new in the use of inorganic salts in yeast production in as large a proportion as indicated by the patent, or in the employment of high dilution of the wort to increase the yield of yeast. The latter expedient was well known as a means of preventing the formation of alcohol, as shown by the Rainer patent and other citations already discussed. Patent 102 seems to attribute the increased yield obtained from high dilution to another cause; namely, that thereby the salts are rendered innocuous to the yeast. But it is hardly necessary in this case to decide the issue of the validity

of patent 102, because, in the opinion of the court, the plaintiff has failed to prove infringement of the patent. It may, however, be said in passing that the plaintiff does not contend that it was new in the art of yeast making to reduce the amount of alcohol produced by dilution of the wort, but defends the validity of the patent on the ground that the references from the prior art do not show methods of yeast production in which the use of inorganic salts is accomplished by high dilution of the wort to offset the resulting acidity.

The plaintiff, in order to maintain its charge of infringement, relies solely on defendant's mash 2086. The materials of which it was composed and the method by which the yeast was made were in all substantial respects similar to those set out in mash 1901. The ingredients include molasses, cereals, ammonium salts, and aqua ammonia. Two worts, called, respectively, a "peptone wort" and a "sugar wort," were prepared. The peptone wort had a high initial acidity of 47, which was reduced to 6 by the addition of the greater part of the aqua ammonia to the peptone wort before it was fed into the vat, and additional amounts of aqua ammonia were added to the vat at the beginning of the period of propagation so that ammonium lactate was formed. Thence the same method of neutralization of the mineral acids released during the process was employed as in the case of mash 1901.

Defendant contends that the scope of patent 102 is restricted to mashes which consist of raw or refined sugar and inorganic salts, and does not cover such a mash as defendant's 2086, which contains molasses and cereals as ingredients. Some reference has been made to this subject in the discussion of the scope of patent 103 in the opinion upon the exceptions to the master's report in the accounting proceedings. The point need not be decided here, for, if it be conceded for the sake of argument that the patent has a broader scope, nevertheless infringement has not been established.

Coming to the question of infringement, it will have been observed that the gist of the patent is the employment of a high dilution of the wort so as to render the salts innocuous to the yeast. It is stated in the illustrative example in the specification that a concentration of not over 2° is used as compared with the usual yeast wort which theretofore had been of a concentration of not less than 3°. The typical claim prescribes "an initial dilution corresponding to not more than 2° on the saccharometer, whereby the said (in-

organic) salts are rendered innocuous to the yeast." It is obvious therefore that, in order to establish infringement, the plaintiff must not only show that a high dilution was employed, but that the object thereof was to render the acids harmless to the growing yeast. The only proof offered by the plaintiff is the manufacture of mash 2086. The balling of this mixture, when introduced into the fermenter, was .8° which gradually increased until at the end of the operation it amounted to 2.7°. Of this concentration, 1°. may be attributed to the presence of the yeast manufactured. Hence the plaintiff contends that it has shown a literal compliance with the provisions of the patent, and that it may be inferred that the effect attributed by the patent to high dilution of the mash was obtained. The plaintiff made no tests to show the practical effect of such dilution upon the mineral acids set free in the solution, but rested on the assertion of its expert, which seems to be well founded as far as it goes, that, since harmful acids were produced during the period of propagation, their deleterious effect must of necessity have been reduced by the high dilution employed. The expert did not vouchsafe the opinion that thereby the acids were rendered entirely innocuous to the yeast.

The defendant on its part takes the position that the high dilution of mash 2086 performed no function with regard to high acidity. It contends, as in the case of other mashes, that no salt problem arises from the concentration of salts or from released acidity; that the buffer materials present prevent the formation of harmful inorganic acid, and that the acids released in the process are weak and nutritive organic acids. The defendant claims that these conclusions were established by certain experiments performed at its factory under the direction of its expert. The same materials were used in these experimental runs as in mash 2086. In the first experiment, the wort was divided into a peptone and sugar wort, as in the case of mash 2086, and, in the second experiment, there were three divisions, in the first of which all the nutriment was placed in the vat at the beginning; in the second, one-half of the nutriment was placed in the vat at the beginning and two-thirds at the end of the tenth hour, and in the third case, one-half at the beginning and the remainder at the end of the tenth hour.

During the course of the tests, the expert took observation of the hydrogen ion concentration, and made certain acidity charts showing the hydrogen ion concentration from

the beginning to the end of the yeast-making process. It is not necessary to discuss at length the complexities surrounding the subject of hydrogen ions and the concentration thereof which indicates the acidity of liquids. It is sufficient to say that certain substances, when dissolved in water, have the property of breaking up into particles called ions, which are charged with electricity. Thus sulphuric acid in solution, which has a formula of $H_2SO_4$ breaks up into hydrogen ions and $SO_4$ ions. These together make up what are called sulphuric acid ions. The hydrogen ions cause the acidity harmful to the yeast if allowed to accumulate in any considerable quantity. The method of expressing the amount of hydrogen ions present in an acid solution involves the use of the symbol pH, which means the potential of hydrogen. For reasons not necessary to be explained, the number of pH units is expressed on a scale upon which the smaller the number of pH units, the greater the acidity. The number 7 is the point of perfect neutrality. Any pH value smaller than 7 is acid, and anything carrying a greater number is alkaline. It has been determined that yeast will grow at about the same rate in an acid solution between the points $pH_3$ and $pH_6$ on the hydrogen ion scale, and, so long as this range is maintained, it makes no difference whether the nutrient solution is composed of the ordinary grain wort or of sugar material and ammonium salts. When a point in the range less than $pH_3$ is reached, the yeast may live but does not increase to the same extent even in the presence of nutriment. And when, on the descending scale, the pH value is less than 2.5, the growth of the yeast ceases altogether.

It has been pointed out that the claims of the patent prescribe that the initial dilution of the wort shall not be more than 2° on the saccharometer, and that the specification declares that such a dilution is favorable, whereas a concentration of 3° which was customarily used prior to the invention, is unfavorable to the growth of yeast when inorganic salts are employed. The defendant's expert, in order to test the effectiveness of the higher dilution thus prescribed, employed an initial dilution of .8° in the mashes used in the first experiment and an initial dilution of 4.4° in the mashes in the second experiment. During the period of propagation, changes took place in the concentration of the worts by reason of the assimilation of nutriment by the yeast, or the addition of food material to the propagating vat. There were also variations in the hydrogen ion concentration of the worts. In the first experiment, the hydrogen ion concentration did not exceed pH 3.5 at any time and in the second experiment did not exceed pH 3.3 at any time in any of the runs. In other words, the records of the tests indicate that the acidity did not reach the danger point in either experiment, and that, from a practical standpoint, there was no substantial difference in the amount of harmful acidity formed in the second experiment as compared with the first. The experiments therefore tend to show that when materials similar to those found in mash 2086 are used in the making of yeast, an initial balling of less than 2° as distinguished from a balling of 3° has no substantial effect upon the acidity of the mash.

It does not follow, as the defendant argues, that there was no acid problem to be taken care of in the manufacture of yeast in mash 2086. In this mash, as in the similar mashes 1368 and 1901 hereinbefore examined, the yeast was shielded from the injurious effect of the mineral acid by the neutralizing effect of ammonium lactate produced in the fermenter. But, on the other hand, the very fact that this neutralizer was employed is an indication that the defendant did not rely on the neutralizing effect of high dilution. The plaintiff has successfully contended, in connection with mashes 1368 and 1901, that, although buffering materials were present in the ingredients employed, the defendant did not depend upon their power, but employed a neutralizer, and therefore violated the claims of patent 106. It may be now said with equal truth that the employment of a neutralizer in mash 2086 justifies the conclusion that it was this expedient, rather than high dilution, which accomplished the desired results. Furthermore, it should be borne in mind that it was well known in the art that high dilution might be employed in order to prevent the formation of an excess quantity of alcohol, and that defendant was lawfully entitled to adopt this expedient. It may be that, if it were clearly shown that high dilution was used for the purpose of offsetting mineral acidity, the defendant would not be protected because earlier workers in the field had used high dilution to prevent the formation of excessive quantities of alcohol. But there is no such clear showing in this case. On the contrary, the evidence indicates that the defendant intended to solve the acid problem by the use of a specific neutralizer.

The plaintiff has failed to sustain the burden of proof, and the court finds that patent 102 was not infringed by the defendant.