## PUETT ELECTRICAL STARTING GATE CORPORATION v. HARFORD AGRICULTURAL & BREEDERS' ASS'N et al.
### Civ. No. 4084.

United States District Court
D. Maryland.
Dec. 31, 1949.

Piper, Watkins, Avirett & Egerton, Baltimore, Md., John W. Avirett, 2nd and R. Dorsey Watkins, of Baltimore, Md., Curtis, Morris & Safford, New York City, Daniel L. Morris and Arthur V. Smith, of New York City, for plaintiff.

J. Cookman Boyd Jr., of Baltimore, Md. and J. Stanley Preston and Oscar W. Jeffery, of New York City, for defendants.

WILLIAM C. COLEMAN, Chief Judge.

This is a patent infringement and unfair competition suit involving starting gates for horses in use on racetracks.

The plaintiff, Puett Electrical Starting Gate Corporation, hereinafter referred to as Puett, is a California corporation and for the past ten years has been engaged in manufacturing starting gates and leasing them to racetracks in various parts of the country. One of the defendants, Harford Agricultural & Breeders Association, hereinafter referred to as Harford, is the proprietor of the racetrack at Havre de Grace, Maryland, and the other defendant, United Starting Gate Corporation, a New York corporation, hereinafter referred to as United, is the owner of a gate used at this racetrack and leased to Harford.

There are two patents in suit, Harris No. 2309952, filed November 6, 1940 and issued February 2, 1943; and Whann No. 2435729, originally filed September 9, 1941 and issued February 10, 1948. Both defendants are charged by Puett with having infringed both of these patents. One of the defendants, United, is also charged with unfair competition as well. Both defendants deny infringement and also assert, as a defense, invalidity of both of the patents on various grounds hereinafter specified. United also denies any unfair business practices.

The evolution of means employed for keeping horses in line and starting them in races involves, going back to very early times, a number of different methods. In early days, the horses were merely lined up across the track and kept in position as nearly as could be accomplished by the riders themselves, and the starter with his assistants, and were sent off by waving or dropping a flag. False starts requiring the horses to be called back were naturally quite frequent under this method. Next, a tape was placed across the track with devices for raising it or snapping it back at the proper time. This method also was not very satisfactory. Then followed the adoption of stalls, some open both in front and rear, and some closed in the rear but open in the front, the assistant starters holding the horses' heads until released at the starting signal. Next followed the adoption of a tape or strap across the front of the stalls constructed so as to spring into the air at the starting signal, but again, these later devices were not satisfactory. The strap barrier was insufficient to resist the impact of an unruly horse and also was not adequate to prevent the animal from at times lunging free under it. The final stage in the evolution of methods for starting horses came with gates or doors on the front of the stalls operated mechanically so as to accomplish what had previously not been accomplished by the other methods, namely, insuring, in addition to satisfactory means for rapidly and simultaneously opening the gates of every stall in a row, that each horse will be prevented from rushing the start, that is, breaking away prematurely, unless a horse becomes extremely unruly while in his stall awaiting the start, in which event the front doors of the stall are so constructed as to open and release such horse, and to permit of these doors being again closed and the horse replaced therein if not disqualified, without disturbing the retention of all the other horses in line. The plaintiff claims that starting gates, constructed under the two patents in suit which it contends have been infringed by defendants, embody certain new and valuable improvements in the art as just briefly described.

The earlier and broader of the two plaintiff patents in suit, namely, Harris patent No. 2309952, involves a device with mechanical and magnetic means in combination for latching and holding two metal gates in front of every stall angularly closed, and for releasing and opening the gates simultaneously upon the de-energization of the magnetic means. The patent points out that mechanical means previously employed for holding gates in closed position have sometimes failed because the latching means are restrained from immediately unlatching by pressure or friction between the mechanical parts. So, in this patent, the pair of gates is held closed by a latch mechanism, with parts that are interengaged and held in such position by magnetic means, the latch being operable upon de-energization of the magnetic means so as to permit pressure of the gate against the latch mechanism to disengage the mechanical parts and permit the gates to open. This patent embraces ten claims but only three of them are in suit, namely, claims 1, 2 and 4, of which No. 4 is the most typical of plaintiff's device and reads as follows: "In a race starting gate, the combination of: a pair of gates pivotally supported at the forward part of said starting gate, said gates being swingable from closed position in which said gates are angularly positioned with respect to each other and with their outer ends adjacent each other to an open position in which said gates are in substantial parallelism; latch means for releasably latching said gates in closed po-

sition, said latch means including a latch element on one gate, a latch lever on the other gate engageable with said latch element but movable to release said latch element magnetic means on the same gate as said latch lever for holding said latch lever in engagement with said latch element, and means for deenergizing said magnetic means to allow said latch lever to release said latch element for permitting said gates to open; and means for moving said gates into open position."

The second and later patent in suit, namely, Whann patent No. 2435729, represents a division of an earlier application, Serial No. 410412, filed September 9, 1941 on which Whann patent No. 2418807 was granted April 8, 1947. Whann No. 2435729 contains six claims, all of which are in suit. This patent is in the nature of an improvement over Harris No. 2309952 and the prior art in that it embraces an alleged different and better arrangement of the means for latching the doors or gates of the stall. In Harris, the magnetic device for controlling the latching means is mounted on the left-hand gate, whereas in Whann it is mounted directly on the superstructure. Otherwise, it is claimed by Puett that the two devices are basically the same, since both embrace the mounting of an arm on the left-hand gate, this arm cooperating with an electric magnet so that this gate is held closed by energizing the magnet, and it in turn, by latching means, keeps the other, or right-hand gate closed, and when the magnet is deenergized both doors instantaneously fly open.

Claim No. 3 of the Whann patent is claimed by plaintiff to be the most typical and reads as follows: "A starting gate having a superstructure including a plurality of partitions, a pair of doors between two adjacent partitions, said doors having pivot means and being swingable from a closed position wherein the side edges of said pair of doors farthest from said pivot means are adjacent to each other, to an open position where the doors are substantially parallel to each other, holding means for holding one of said doors of said pair in closed position, said holding means including: arm means rigidly mounted on said door and extending at an angle from the plane of said door, said arm means having a free end, a member having a pair of ends, means pivotally mounting said member at one of its ends on said free end of said arm means, a solenoid provided with an armature, means attaching said solenoid to a stationary part of said superstructure and means pivotally attaching said armature on a fixed pivot adjacent to said solenoid, the other end of said member being in engagement with said armature when said door is in closed position and during the time said armature is in engagement with said solenoid while being attracted thereby, and a plate member having means adapted to engage the other door and hold the same in closed position when said other door has been moved to closed position."

None of the other five claims in this Whann patent embrace any material change over claim 3, except that they all omit any reference to a *plate member* on the left-hand door, with means adapted to engage the right-hand door and hold the latter in closed position until the former is released by the magnetic element. In other words, except for this omission, the other five claims of the patent are different from claim 3 only in phraseology respecting mechanical design and functioning of the device.

### Infringement.

The starting gate of United, which Puett claims infringes both of the patents in suit, is very similar in numerous structural features to the starting gates constructed in accordance with the specifications and claims of both of those patents. This is made clear by an inspection of the models introduced in evidence and which have been of very great help to the Court in comparing one device with another. That is to say (1) the general form of the metal superstructure in all three devices is the same; (2) they all have a solenoid magnetic device for holding the left-hand door of each stall closed until released manually by demagnetizing the armature and (3) they all have some form of device fastened to the left-hand door of each stall which enables that door to latch or

hold closed the other or right-hand door when the solenoid is magnetized. But there is one difference immediately apparent. It is that in both of the patented devices in suit, the doors are angularly related, that is to say, when meeting each other in closed position they are not at right angles to the sides of the stalls, whereas the doors of the device of United are. United claims that this difference is important with respect to the latching or holding devices of the respective gates, to which we will refer more specifically in a moment. Also, while the Puett gate, constructed in accordance with the Harris patent, carries the solenoid magnetic element on one of the gates, that is, on the left-hand gate, this element is carried on the superstructure in both the United's gate and the gate constructed pursuant to Puett's Whann patent. However, we believe that this fact deserves no more than passing notice, because we cannot see that a difference in location of the solenoid magnetic element has any material bearing upon the question of infringement, either in and of itself or when considered in relation to other parts involved in the separate mechanism of the different devices, as will be made more apparent by what is hereinafter stated.

## Whann Patent No. 2435729.

Turning now to a more analytical examination of the models of both patented devices and of the device of United, and taking up first the Whann patent, it will be seen that its claim 3, above quoted, when separated into its component elements, calls for four basic things: (1) an arm rigidly mounted on the left-hand door and extending at an angle from the plane of that door, this arm having a free end; (2) a member having a pair of ends, with means for pivotally mounting it at one of its ends on the free end of arm (1); (3) a solenoid provided with an armature and means° for attaching this solenoid to a stationary part of the superstructure, and also means for pivotally attaching the armature on a fixed pivot adjacent to the solenoid, the other end of member (2) being in engagement with the armature when the left-hand door is in closed position and while the armature is in engagement with the solenoid when magnetized; and (4) a plate member rigidly fixed on the left hand door with means adapted to engage the right-hand door and hold it in closed position, when the left-hand door is moved to and held in similar position when the armature is magnetized.

Having thus analyzed the component parts of this Whann patent, we now turn to a comparison of it with the device of United. As to the latter, we find it does have (1) an arm rigidly mounted on the left-hand door extending at an angle from the plane of that door, this arm having a free end. It also has (2) a member with a pair of ends, one of which is pivotally mounted on the free end of the rigid arm; (3) a solenoid with an armature and means attaching it to a stationary part of the superstructure, and also means attaching the armature on a fixed pivot adjacent to the solenoid, with the other end of the rigidly mounted arm in engagement with the armature when the left-hand door is closed, and while the armature is engaged with the magnetized solenoid; and lastly, it has, in addition to a plate member rigidly affixed to the left-hand door, the equivalent of means adapted for this plate to engage the right-hand door and hold it in closed position, because, although the United holding device consists merely of a plate on the left-hand door that overlaps the rim of the right-hand door when both doors are closed, whereas the Whann holding device consists of a plate on the left-hand door with hooked end that engages another plate on the rim of the right-hand door, they are both of such common, simple construction, and have been so long in use to serve exactly the same simple purpose although not in this particular art, that they must be taken as equivalents.

In spite of the aforegoing, United insists that both the structure and mechanism of its device are materially different from that of the Whann patent for the reason that the arm which connects the rigid member on the left-hand door to the armature is in the nature of a crankshaft in its, the United, device, both ends of which are se-

cured,—one to the rigid member on the door and the other to the armature; whereas in Whann, the corresponding element is constructed like an arm with a claw which engages a claw on the armature when the latter is magnetized but flies free of that claw, that is to say, completely detaches itself, when the armature is demagnetized. However, there is no requirement in claim 3 or in the specifications on which the claim reads that this so called claw member shall ever be detached from the armature, the claim merely reading that "the other end of such member being in engagement with said armature when said door is in closed position and during the time when said armature is in engagement with said solenoid while being attracted thereby." The difference in the two modes of construction is essentially a difference ·called for by the location of the solenoid and armature. That is to say, the difference lies in the fact that in the United device, the connection between the armature and solenoid and the left-hand door is made from near the middle of the outer side of that door, whereas in the Whann device, that connection is made from the top of the door. An examination of the two models shows that this difference in location merely requires, for the performance of the same function in one device, a reversal of the action of the same component parts in the other device. That is to say, in the case of the United device, the crank arm is pushed forward when the armature is held against the magnet, whereas the corresponding arm in the patented device is pushed backward to produce the same result.   ·

■ United also claims that the location of the armature on its device is a distinguishing feature in that the patent calls for its location on the superstructure and that locating it at the bottom of one of the pillars of the superstructure is not equivalent to locating it on the superstructure. We consider that this distinction is too tenuous to be given any weight, particularly since the specifications of the patent expressly provide "that the term 'superstructure' includes all stationary parts of the starting gate including the frame work, the parti-

tions and the supports therefor,   *   *   *." Lastly, we believe that there is no merit in the contention of United that its exclusive use of a plate affixed to the left-hand door, as the sole means for holding the right-hand door in closed position with it, is not the equivalent of the plate means referred to in claim 3 of Whann because, as it is alleged, the plate of United would not function successfully if used with Whann, since the doors close angularly. It is to be noted that in claim 3, the plate member and the means for engaging · and holding the right-hand door in closed position are very broadly stated. No particular form is prescribed. When the doors are placed in angular position, it is at once apparent that there must be some kind of a hook or clasp on the left-hand door engaging the right-hand door, or some device thereon in order to keep the right-hand door closed; and that as the angular position of the doors is flattened, the need for a latching device becomes increasingly less until the doors are closed rectangularly to the sides of the stall when a flat plate, rigidly fixed to the left-hand door and overlapping the right-hand door, will suffice. This illustrates, we think, not only the fact that no importance is to be attached to the distinction claimed by United for its device for holding the two doors together, but that, likewise, there is no importance to be attached to an angular, as contrasted with a flat position of the doors when closed. It becomes merely a question of degree in the juxtaposition of common elements long known and used in the same way, for the same simple purpose. Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Oates v. Camp, 4 Cir., 83 F.2d 111; Wine Ry. Appliance Co. v. Baltimore & Ohio R. Co., 4 Cir., 78 F.2d 312; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910.

Therefore, we conclude that all six claims of the Whann patent are infringed by the United device.

### Harris Patent No. 2309952.

Turning now to the Harris patent, typical claim 4 which we have above quoted will be seen to embrace three major elements: (1) a pair of gates swingable from a closed angular position to an open position in which they are in substantial parallelism; (2) latched means for releasably latching the gates in closed position, such means including a latch element on one gate which engages a latch lever on the other gate, and (3) magnetic means on the left-hand gate for holding the latch lever in engagement with the other latch element and means for deenergizing this magnetic means so as to allow the latch lever to release the latch element and permit the gates to open.

Claim 1 does not require the magnetic means to be mounted on the gate. Also, claim 1 defines the latching device in somewhat different terms, namely, "latch means for latching said gates in closed position including a first latch for preventing one gate from moving relative to the other, and second latch for preventing the other gate from moving relative to the first gate."

Claim 2, like claim 4, requires that the magnetic means be located on the gate. Also, the latching device is set forth in language more nearly akin to that of claim 4 than to that of claim 1.

As respects this Harris patent, the defense of non-infringement by United is more confidently asserted than it is as respects the Whann patent because of the fact that whereas Whann embraces a very simple latching device, the Harris patent embodies a very much more complicated, double latching mechanism which, therefore, as United claims, cannot under the most liberal doctrine of equivalents be said to approach the simple, rigid, one-piece holding device of United, consisting of a single plate involving no mechanism whatsoever.

As opposed to this contention, it is claimed for Harris that the United device does infringe because it performs the same function in the same way, in that the plate on the left-hand door in the United device lies across the outer frame of the right-hand door which, as is claimed, may, within the breadth of the specifications and the language employed in the claims of that patent, be treated as a latch element on the right-hand door. Then, it is contended that the plate pivots, in the sense that the left-hand door to which it is rigidly fastened, swings or pivots, and that therefore the plate must be said to pivot. It is further contended that although the magnetic means in the United device is not actually on the left-hand door, it is for all intents and purposes so located, because so closely attached to and operably associated with it.

As respects the location and operation of the magnetic means in both devices, from the point of view of equivalents, we believe they are substantially the same. Also, our conclusion that the closed angular position of the doors in the Whann patent is not distinguishable, under the doctrine of equivalents, from the closed "flat" position of the doors in the United device, applies as well to this Harris patent. However, we are not impressed with the rest of the argument just described and advanced by Puett particularly with respect to claims 1 and 2 of the Harris patent, because we think it transcends all reasonable bounds of the doctrine of equivalents, for the simple reason that it cannot be accurately said that a mere fixed plate is the equivalent of a *dual* latching device which embraces parts on each door consisting of two distinct units operating in specific inter-relation to each other. It is true that, as noted above, claim 4 of the Harris patent does not specify a *dual* latching mechanism as do the other two claims (1 and 2) in suit, but merely calls for "latching means for reasonably latching said gates in closed position, said latch means including a latch element on one gate, and latch lever on the other gate engageably with said latch element but movable to release said latch element." However, even this broad language calls for "a latch element" on the right-hand door which is not true with respect to claim 3 of the Whann patent in suit, to which we therefore accorded more breadth of application. Furthermore, the specifications of this Harris patent, upon which claim 4 must be read, unequivocally

call for at least *some latch* element on the right-hand gate. This is demonstrated by the following quotation from the closing paragraphs of the specifications: "The co-engagement between the latch element 25 and the lug 28 produces a pressure against the latch lever 26 which will assist in its opening and, in fact, cause its instantaneous opening upon deenergization of the magnet. The other latch means which includes the parts 41 and 42 is automatically released upon initial outward movement of the gate 19.

"In the foregoing description we have disclosed a preferred form of our invention. It should be understood, however, that various alterations and modifications may be made without departing from the spirit and scope of our invention. We wish our invention to be construed in accordance with the preceding statement of invention and appended claims. For instance, it is within the scope of this invention to mount the magnet and latch lever in any position on the starting gate where the lever may engage the latch element of each pair of gates." Therefore, we conclude that the United device does not infringe either claim 1, 2 or 4 of the Harris patent.

## Unfair Competition.

In addition to the charge of infringement which, as just explained, we find proved with respect to the Whann, but not the Harris, patent in suit, Puett claims that United, as manufacturer and lessor of the infringing device, has been guilty of unfair competition for which Puett claims it is entitled to punitive damages, in addition to such profits and damages as may be awarded it under the patent laws.

The testimony shows that from 1940 to 1946 the only mechanical starting device used by Cassidy, United's president, who, during that period, was the official starter at leading tracks in the country, was the device of the Harris patent in suit. It is also uncontradicted that when in August, 1946, Cassidy organized the United company and got the Hempstead Welding Company to build its first gate, they had detailed blue print drawings of the entire structure and mechanism of the device un-der the Harris patent as then used by Puett; also, that Deen, who had been Puett's general manager, left Puett and associated himself with Cassidy. Furthermore, the testimony shows that United first used its device with the plate constructed on the left-hand door for engaging and holding the right-hand door, in the Winter of 1946-47, in Florida; that upon Puett objecting that this starting gate infringed the magnetic device of patent to Whann No. 2418807, of which the Whann patent in suit is a divisional patent, this arrangement of the magnetic device was removed by United and that of the Whann patent in suit was substituted but the plate was, nevertheless, retained, but with this construction, United's device was first used at the Jamaica, Long Island, track in July, 1947. While there is no evidence that United had knowledge of Whann patent No. 2418807 earlier than April, 1947, because that patent was not issued until April 8, 1947, and while the same is true with respect to knowledge of the Whann patent in suit because not issued until February, 1948, nevertheless, Puett contends that United must have known of Puett's device as covered by both of these patents as early as April, 1947, because disclosed, as above stated, in the earlier Whann patent. Furthermore, it is contended by Puett that anyone examining the file wrapper in the Patent Office of the earlier Whann patent would have seen that the subject matter of the later Whann patent in suit was being reserved for a divisional application. It is upon such disclosures in the testimony as the aforegoing that Puett bases its contention of unfair business practices on the part of United resulting in the tracks in New York, Maryland, Florida and Michigan leasing the United gate instead of Puett's with the result that Puett has lost revenue from its gate on some 1500 racing days. In other words, Puett contends that the background of the beginnings of United, and the chronological steps in the development of its gate indicate that United deliberately used the knowledge which it had acquired from Puett with respect to its device whereby it was enabled to, and did deliberately copy the Puett

device and drove Puett off most of the largest tracks in the country, and that what United had done has been not to try to avoid conflict with the Puett device, but to camouflage the fact that it has copied it by making minor changes in some of the basic elements that go to make up the combination in which lies the basic novelty of Puett.

While there is considerable weight to this argument, it is after all based upon little, if anything, more than the cumulative evidence that this Court has heard which supports Puett in its claim of infringement to the extent heretofore indicated. This being true, we feel that the testimony respecting unfair competition, as such, when divorced from the question of patent infringement itself, is not sufficiently strong to warrant our ruling that Puett is entitled to redress on this separate score. We are influenced in this conclusion to some extent by the character of the devices here in issue. That is to say, while there may well have been a technical abuse of the confidence which Puett had imposed in Cassidy and also in Crist, one of the partners in the welding company which built the first gate for United, with respect to the knowledge they had acquired of Puett's device, there is no evidence that the latter had become so distinctive merely in appearance as to condemn what United did, apart from the question of infringement, particularly since starting devices are not like commodities for which there is a general market but are dealt in only by formal, special contracts.

## Clayton Act.

We are not, however, impressed with United's counter charge that Puett is before the Court with unclean hands, in other words, that even if one or both of its patents in suit are valid and have been infringed by United, Puett has misused these patents in violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14, in that Puett's leasing agreement provides in substance that during every racing day that a particular track operates during the term of the agreement, such track will use only the Puett gate.

Section 3 of the Clayton Act makes it unlawful, as part of interstate commerce, to lease or sell commodities or products of any kind, whether patented or unpatented "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in" the commodities or products of a competitor of the lessor or seller, where "the effect of * * * such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." While it is true that the Supreme Court has given great breadth to this provision, on the testimony in the present case there is nothing to indicate that Puett is, by its restrictive lease, likely "to substantially lessen competition or tend to create a monopoly" with respect to its gate. On the contrary, as we have pointed out, United has been successful in getting most of the large tracks throughout the country to lease its, rather than Puett's gate.

In support of its contention that Puett's leasing agreements violate the Clayton Act, reliance is placed upon such decisions of the Supreme Court and lower federal courts as Carbice Corporation of America v. American Patents Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Morton Salt Co. v. G. S. Suppinger Co., 314 U.S. 488, 788, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Mercoid Corporation v. Mid-Continent Co., 321 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; and McCullough v. Kammerer Corporation, 9 Cir., 166 F.2d 759, certiorari denied 335 U.S. 813, 69 S.Ct. 30. But none of these cases, nor any others that we have found are sufficiently similar on the facts to be binding or even persuasive authority for the contention of United. Most of them that do involve an interpretation of the Clayton Act embrace re-sale agreements and so-called "tying clauses" which make it a condition of the lease that the lessee shall use in connection therewith exclusively material or machinery purchased from the patentee-lessor. No such condition is involved here. It is true that in the McCullough case, supra, the Ninth Circuit Court of Appeals

struck down a licensing agreement which gave the licensee *exclusive* right to manufacture and use, but not to sell, the licensor's patented oil well pipe cutter on condition that the licensee would not manufacture, use or rent any other pipe cutter. The licensor also, in order to complete the patent monopoly, bound itself by a similar restrictive covenant. In the present case no such *exclusive* license to a single licensee has been given or contemplated by Puett. As a matter of fact, one of United's license agreements, placed in evidence, is even more restrictive in the manner complained of than is the Puett form of license agreement.

## Validity

### Double Patenting as Respects Whann Patent No. 2435729.

A further defense is that the Whann patent in suit is invalid on the ground of double patenting. That is to say, United claims that while this patent is described as a division of the earlier Whann patent, the Patent Office as a matter of fact never actually made such a division in conformity with the patent law requirements, since claims 5 and 11 of the earlier Whann patent are alleged to cover what is patented by the later Whann patent in suit; that there is nothing to indicate in the earlier Whann patent that there has been a division of it, but that even if there had been such indication, this would not have cured the legal deficiency, because both patents embrace the same thing and therefore constitute double patenting which is forbidden and which invalidates the second or later Whann patent in suit. United claims that by reason of this alleged double patenting, if it is permitted to stand, Puett obtains an extension of its monopoly acquired by the earlier Whann patent. That is to say, on March 31, 1947,—only nine days before the earlier Whann patent was issued,—the inventors filed their application in the later Whann patent. This patent was not issued until February 10th, 1948, whereas the earlier Whann patent was issued on April 8, 1947. Thus, since the monopoly of a patent dates from time of issuance, in the present case it will be extended for approximately ten months.

It is true that, prima facie, the earlier Whann patent appears to embrace part of exactly the same subject matter as the later Whann patent in suit. There are annexed to the earlier patent, eight drawings or figures, and to the later patent, three figures, the first one being identical with figure 5; the second one with figure 6, and the third one, with figure 7, all in the earlier patent. It appears from the file wrapper of the Whann patent in suit that no consideration whatever was given by the Patent Office to the question of double patenting. United claims that the point was overlooked by the Patent Office because not called to its attention, but as respects Puett, United contends that deliberate advantage has been taken of this double patenting in order illegally to secure an extension of the patent monopoly.

Admittedly the matter is confusing and we believe it is not possible to determine whether the defense of double patenting is sound without analyzing in detail the precise action of the Patent Office as disclosed by the file wrapper with respect to the earlier Whann patent. Such detailed analysis discloses the following: The application was originally filed September 9, 1941, embracing 11 claims. The Patent Office thereupon required applicants to direct all of their claims to one of three forms, namely, to form I as exemplified by figures 1 to 4, inclusive, annexed to the patent, which includes a "yieldable means" on one part or member of the latching device, that is, a means that is movable so as to permit engagement with the other member of the latching device; to form II as exemplified by figures 5 to 7, inclusive, which does not embrace a "yieldable means" as part of the latching device, but does call for the armature being so constructed as to be "biased to released position by gravity", that is, heavier on one side of its pivot than on the other side; or to form III as exemplified by figure 8 (which we need not analyze, because abandoned by applicants). The patent examiner disagreed with applicants' contention that claim 5 was a generic

claim broad enough to read on all three forms, and for this reason required applicants to make the above election since under the patent laws only one invention may be embraced in a single patent. Therefore, if an application embraces more than one invention and there is no generic claim embracing all of the inventions as the examiner found to be true in this instance, an election is necessary. Thereupon, nine more claims were added and there followed elections and cancellations with respect to numerous claims by the applicants which it is unnecessary to give in detail. Then, on December 5, 1944, the application was further amended by the addition of another claim, no. 21, which applicants contended was a broad generic claim, sufficient to remove any question as to whether the application contained a claim generic to all forms of the invention. However, this new claim was rejected on references and the Patent Office still persisted that the application was devoid of any single, all inclusive generic claim. As a result, applicants appealed to the Board of Appeals which on November 29, 1946 sustained the examiner.

As a result of this ruling, on February 27, 1947, applicants filed an amendment to their application in which many formal changes in the claims were made, including entire abandonment of form III (figure 8) and also cancellation of all claims which read on form II (figures 5, 6 and 7), but applicants expressly reserved these claims for the filing of a divisional application. Applicants then presented to the examiner additional claims Nos. 22 to 28, all relating to figures 1 to 4, inclusive. As a result, claim 22 was renumbered as claim 5 and on March 6, 1947, the examiner allowed the application with eleven claims (including no. 5 just mentioned), which became the earlier Whann patent, and seasonably, on March 31, 1947, applicants filed their application for the divisional patent embracing form II, figures 5, 6 and 7 of the earlier patent.

To summarize the above chronology with respect to the earlier Whann patent through the Patent Office, applicants had contended for a broad claim covering all three forms of that patent up to the time of the adverse decision of the Board on November 29, 1946, as a result of which, on February 28, 1947, they cancelled all claims to form II represented by figures 5, 6 and 7 of that patent which are figures 1, 2 and 3 of the later Whann patent in suit, and there is nothing to indicate that applicants had not been bona fide in their insistence upon a broad claim until the adverse decision of the Board. Also, it is clear that they were not in position to file the divisional application on which the Whann patent in suit issued until after the Board decided against them. As a result of the cancellation of all claims in the original Whann patent relating to form II which had no "yieldable means" as part of the latching device and no armature biased to released position by gravity, of the eleven claims allowed to be retained in that patent, nos. 1 to 4, inclusive embrace the "yieldable means" in the latching device, but not the armature with gravity-bias; and nos. 5 to 11, inclusive, embrace the armature with gravity bias but not the "yieldable means" in the latching device.

The divisional patent in suit contains six claims none of which as just explained, embraces either the "yieldable means" in the latching device or the armature with gravity bias. It is true that in form II covered by this patent and as represented in the model of this form introduced in evidence, the armature is, in a degree, biased to a released position by gravity, but not unaided and to the extent that the armature is in form I, because it is magnetized from vertical or upright position and its released position is largely effected by the pull of the latch mechanism which engages it; whereas the armature in form I is magnetized from a horizontal position and it is biased to a released position completely by gravity.

■ In view of our analysis as above of the claims embraced in the two patents, we conclude that this is not a case of double patenting. In order for that to exist there must be a duplication of some claim in the later patent that is embraced in the earlier

one. This is not true in the present instance. In other words, before the defense of double patenting is available, a claim or claims of the two patents must be the same with the result that the first patent cannot be practised without infringing the second, and the second cannot be practised without infringing the first. Standard Brands, Inc., v. Federal Yeast Corporation, D.C., 38 F.2d 329, and cases cited. The fact that an invention embraced in a second patent is disclosed in an earlier patent is not fatal if not claimed therein, and if applications for both patents were co-pending. Montgomery Ward & Co. v. Gibbs, 4 Cir., 27 F.2d 466.

■ It is asserted on behalf of United that claims 5 and 11 which applicants were allowed to retain in the first patent, do embrace what is covered by the divisional patent in suit, but we do not agree. Claim 5, just as claims 6 to 11, inclusive, calls for an armature biased to a released position by gravity as shown by figure 3 of the earlier patent, and such is neither referred to in the specifications taken from the first patent and carried over into the second, that is, the patent in suit nor in any claim in the latter. As for claim 11, that also is different from all claims in the patent in suit because calling for an armature biased to a released position by gravity, and indeed is different from them and also from all other claims in the earlier patent because it provides for two arms, one on each door, going out to the armature in diagonal position.

While for the reasons just stated, we find all the respective claims of each of the two patents distinguishable from each other, we cannot pass from this question of double patenting that has been unsuccessfully raised without alluding to the very confusing and we feel indefensible practice followed in the Patent Office as illustrated by the situation in the present case. We refer to the matter of allowing specifications and drawings relating solely thereto to remain in the first patent as issued, although they no longer form any part of that patent because removed therefrom into a divisional patent. It is bad enough to find, as in the present case, the first patent devoid of any disclosure whatsoever that it has been divided. This clumsy, confusing practice is not, of course, cured by the fact that the later divisional patent does recite both in its caption and specifications that it is a division of the earlier application and patent. We understood that since these patents issued the Patent Office procedure has been changed to the extent that the first as well as the divisional patent must disclose the division. However, this is obviously not sufficient reform in the procedure. Specifications and drawings or figures should be scrupulously allocated to the particular patent to which they exclusively belong. Failure in this respect encourages protracted, if not in fact, needless litigation, and greatly adds to the tedious burden imposed upon the District Courts in their efforts to determine what actually was the position assumed by the Patent Office and why.

## Prior Art
### Harris Patent No. 2309952.

Since we have found that none of the claims, here in suit, of the Harris patent has been infringed by United and since neither defendant has filed a formal counterclaim, and this is not a suit for a declaratory judgment, a question arises, in view of the ruling of the Supreme Court in Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 and Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed 1450, whether this Court should pass upon the validity of any of the claims in suit of the Harris patent.

■ In the first of the Supreme Court decisions just mentioned, the Court held that in a patent case which was tried only on bill and answer and in which the District Court found non-infringement, it was error for that Court also to hold the patent valid, since if not infringed, this was to decide a hypothetical case. In the second decision of the Supreme Court just mentioned, it was held that although in conformity with the Electrical Fittings Corporation case, a decision of non-infringement disposes of a case tried only on bill and answer, it does not dispose of one involving a counterclaim or a de-

claratory judgment which raises the question of validity. See also Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165. However, since the answer filed by United specifically prays for an adjudication of invalidity with respect to both patents in suit, we are not certain that to proceed with an adjudication as to the validity of the Harris patent will be contra to the ruling in the Altvater case, supra. Therefore, we will proceed to pass upon the validity of claims 1, 2 and 4 of the Harris patent which are here in suit.

As anticipation of this patent, the defendant relies upon the three following earlier patents: Patent to Bland, No. 1743875, application filed December 28, 1927, and issued January 14, 1930; patent to Cotaya No. 220,127, application filed March 19, 1879, and issued September 30, 1879; and patent to Whyte, No. 1545,176, application filed April 17, 1922, issued July 7, 1925.

As respects the patents to Cotaya and Whyte, little need be said because neither of them has to do with a combination of elements such as is involved in the Harris patent, and they both relate to devices remote from the art with which we are here concerned. Cotaya embraces an electrical device for opening shutters, the object of which is to furnish an improved method for opening automatically the shutters of warehouses and the like in case of fire, thus allowing firemen to gain prompt access to such buildings. The method of operation of the device is as follows: A sensitive bar is expanded by heat, and is thereby brought in contact with a contact point thereby closing the circuit of a battery and causing a magnet to attract an armature. The armature, thus moved, releases a catch lever which operates to release a weighted bar which in turn operates a somewhat complicated mechanism which releases a key that fastens the shutters, and allows springs to force the shutters open.

The only similarity, if it can be called such, between Cotaya and Harris lies in the fact that they both embrace a magnet and armature. But even here there is a distinct difference in that in Cotaya the magnet is energized to trip, i. e., to operate the shutter-releasing mechanism which is just the opposite of the magnetic use in Harris, that is, in Harris the magnet is de-energized to open the gate, as will be more fully disclosed in our later reference to the patent to Bland.

An earlier starting gate, Puett patent No. 2,232,675 filed August 7, 1939, and issued February 18, 1941, involves use of an armature and magnet in a manner similar to that of Cotaya, i. e., energizing the magnet in order to open the gate. Both parties to the present suit concede that this earlier Puett patent does not anticipate Harris.

The Whyte patent is clearly in no sense in anticipation of Harris. It embraces an alleged improvement in bolts such as are used on the exit doors of theatres, commonly designated as panic bolts. The locking mechanism is arranged within the door and has a connecting rod and certain operating parts concealed. The device does not embrace a magnet and therefore, for this reason alone, is not worthy of being considered as in anticipation of the combination involved in Harris.

As respects Bland, while it embraces a device falling within the same general field as the device of Harris, we are satisfied that it does not anticipate Harris. The Bland device is an electrical starter for racing dogs such as whippets and greyhounds, its general object being to provide a latching mechanism which holds two swinging doors closed, but which when released by means of an armature and electro-magnet, permits the simultaneous opening of both doors of each starting box. Thus, broadly speaking, we find in Bland a combination akin to that embodied in Harris. However, there is this definite, and we believe apart from everything else, controlling difference, namely, in Bland, as in the earlier Puett patent, the gates are released by application of magnetism, whereas precisely the opposite is true in Harris, namely, they are released by de-energizing the armature.

It is contended that this reverse use of magnetism is merely a common alternative and therefore is to be considered as an equivalent of the method employed by Harris. But with this we cannot agree because there is a very substantial advantage obtained by releasing the doors as is done by Harris, as compared with the method employed by Bland and herein we believe lies the very heart of the novelty and utility embodied in Harris over the prior art.

In Harris, when all the magnets are in proper condition and are energized to hold the series of gates closed and the starter pushes the button, all open simultaneously. But if one of the gates should become short-circuited, the magnet controlling it would be deenergized and that gate would be opened, which would not be true in the case of Bland because the magnet controlling each gate would have to be energized, not deenergized, in order to permit its release. In other words with Bland, since the magnet has to be energized in order to trip the door-releasing mechanism, should one magnet be faulty it would be energized so if employed for starting horses the releasing mechanism would not operate and the horse in a stall controlled by such faulty magnet would be confined therein, —left at the post,—to be later manually released with the rest of the horses gone away.

The practical advantage of Harris over Bland is even greater and may be illustrated as follows: In case there is an unruly horse in one of the stalls and he strikes either of the doors or gates of his stall with a force which exceeds the maximum at which the rheostat is set, then the doors of this particular stall are released and the horse is let out without breaking anything, whereas if the Bland device be used for starting horses, in the case of an unruly horse, the mechanism to release the doors of his stall would require some manual control or the breaking or injuring of the mechanical device. Furthermore, Harris embodies a distinct advantage over Bland in the case of the force applied to one or more of the gates or doors of a given stall by the normal lunges of a horse waiting to be released, because in Harris, the mechanical latching means are held in position by an energized magnet so that there is the advantage of a combination of mechanical and magnetic means operating together which is not true in Bland because, as just explained, when the gates are closed, the magnet is deenergized.

It is to be noted that while Bland was not directly cited to the Patent Office with respect to the Harris patent, it nevertheless was before the Office when Whann patent No. 2418807 and its divisional patent No. 2435729, and also the earlier Puett patent No. 2232675 were before the Office.

■ We thus conclude that the three claims in suit of the Harris patent are not anticipated by any disclosure in the prior art and therefore valid. To be sure, every element in the combination of Harris was old in the art when he put them together. But no one had previously done so in the same way. It marked a distinct advance in the art, as attested by its commercial success. See Wine Ry. Appliance Co. v. Baltimore & Ohio Railroad Co., supra.

### Whann Patent No. 2435729.

■ The only prior patent which it is urged on behalf of defendant anticipates Whann is a patent to Comfort, No. 1870768, filed January 27, 1932 and issued August 9, 1932. This patent, together with patent to Steele, No. 2193257, issued March 12, 1940, represents the early use of magnetism in race starting apparatus.

Comfort embraces two doors with a pivotal arm extending from each, connected by so-called links or other arms with an armature which slides in a guide-way by means of which it makes contact with an electro magnet mounted on the superstructure. It also embraces a light-sensitive device with which we are not here concerned, adapted to be affected by the movement of each horse to the starting position and means for automatically throwing open the gates of each stall when all the horses are in proper starting position.

Comfort embraces no latching device of any kind on the gates. That is to say, they are held closed entirely by electro magnetism. For this reason it cannot be said that the device is the equivalent of one which involves a locking device consisting of a combination of interrelated mechanical and magnetic controls such as is involved in Whann. It is true that Comfort differs from the device of United which we hold infringes Whann in three respects: (1) In Comfort, both gates are connected to the armature whereas in the device of United only the left-hand gate is so connected; (2) in Comfort, the magnet is located on the superstructure whereas in the device of United it is affixed to the lower side of the superstructure; and (3) in Comfort, the armature slides whereas the armature of the United device is pivoted. On behalf of United it is contended that all three of these differences are immaterial and that therefore if Whann is to be interpreted as being infringed by the device of United, then Comfort must anticipate both. However, we are not impressed with this reasoning because we believe that the similarity between the device of United and Whann which amounts to infringement is distinguishable from the similarity between Comfort and either Whann or the device of United. Our reasons for making this distinction are sufficiently indicated by what is said in the earlier part of this opinion under infringement, and therefore we do not believe they need be repeated here. Furthermore, Comfort, like Steele, is nothing but a paper patent. There is no evidence in the present case that the Comfort device was ever put into use as a starting gate at race tracks. From this fact it is entirely reasonable to presume that it was not used because it was not found to possess the necessary elements of a satisfactory gate. Also, it is to be noted that Comfort as well as Steele were before the Patent Office in connection with Harris or Whann, or both.

We therefore conclude that the Whann patent is not anticipated by any prior art disclosure, and is therefore valid.

## Modification of the Claims of Whann Patent No. 2435729

### Intervening Rights.

The contention is made on behalf of United that some five or six months after the filing date of the application for the Whann patent, Puett, as a result of photographs which it had taken of the starting gate being used by United, radically amended all six claims in this patent application, so as to read on the device of United, in derogation of the rights of United which had meanwhile been established in their device by commercial use. However, we do not find anything in the testimony that supports United in this contention.

What Puett did was not improper and did not constitute any amendments to the claims that were not reasonably related to the basic subject matter of the alleged invention or its equivalents. If United was employing any of these equivalents, Puett had the right to investigate, and reframe his patent claims accordingly. See Proctor & Gamble Mfg. Co. v. Refining Inc., 4 Cir. 135 F.2d 900. There is no proof that Puett did anything contrary to the principle with respect to the protection afforded to intervening rights as announced in such cases as Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053; Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 573, 59 S.Ct. 8, 83 L.Ed. 34; and Mackay Radio & Telegraph Co. v. Radio Corp., 306 U.S. 86, 618, 59 S.Ct. 427, 83 L.Ed. 506.

### Summary of Conclusions.

Our conclusions, summarized, are as follows: (1) *Infringement:* all six claims of Whann patent No. 2435729 are infringed by the starting gate of United. None of the three claims in suit (nos. 1, 2 and 4) of Harris patent No. 2309952 is infringed by the starting gate of United. (2) *Validity:* All six claims of Whann patent No. 2435729 are valid. The three claims in suit (nos. 1, 2 and 4) of Harris patent No. 2309952 are valid. (3) *Unfair Competition (apart from Infringement):* Not proven as alleged against United.